Argued and submitted October 12, 1984, affirmed December 4, 1985

# EMERALD PEOPLE'S UTILITY DISTRICT,
## *Appellant,*

*v.*

# PACIFIC POWER & LIGHT COMPANY,
## *Respondent.*

## (E83-1726; CA A30473)

### 711 P2d 179

John R. Faust, Jr., Portland, argued the cause for appellant. With him on the briefs were James M. Finn, Cynthia S. C. Shanahan, and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Charles F. Hinkle, Portland, argued the cause for respondent. With him on the brief were Jeffrey Michael Alden and Stoel, Rives, Boley, Fraser & Wyse, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

**BUTTLER, P. J.**

Emerald People's Utility District (Emerald) filed this action pursuant to *former* ORS 543.610 for a judicial determination of the price to be paid for hydroelectric dams, located outside the district, that Emerald proposed to take over from Pacific Power & Light (PP&L) under the provisions of that statute, which, before its amendment in 1983, provided:

> "(1)  Upon not less than two years' notice in writing the state, or any municipality thereof, shall have the right at any time to take over and thereafter to maintain and operate any project constructed under a license pursuant to ORS 543.010 to 543.620, upon payment of the fair value of the property taken over, not exceeding the net investment as defined in ORS 543.010(2), plus such reasonable damages, if any, to valuable, serviceable and dependent property of the holder of the license, not taken over, as may be caused by the severance therefrom of the property taken, and shall assume all contracts entered into by the licensee which are required to have and do have the express approval of the commission. The net investment shall be determined in accordance with the provisions of ORS 543.010 to 543.620. If the sum to be paid cannot be agreed upon by the holder of the license and the municipality or the state, as the case may be, it shall be determined in a proceeding in equity instituted by the state or municipality, as the case may be, in the circuit court of the county in which the major part of the project is located.

> "(2)  There is also expressly reserved to the state, and any municipality thereof, the right to take over all or any part of any project by condemnation proceedings as may be provided by the laws of Oregon or the charter of any such municipality."

The trial court dismissed the complaint, holding that a PUD may not avail itself of the benefits of ORS 543.610, because it is not a "municipality" as that term is used in the statute. We affirm.

The thrust of plaintiff's argument is that PUDs have been granted a general power of condemnation, that that power authorizes them to condemn existing power generating facilities, such as those involved here, and that it would be absurd to conclude that the legislature did not intend to

include PUDs within the term "municipality" when it enacted the original version of ORS 543.610 in 1931,[1] authorizing the taking of such facilities by paying less than just compensation. As discussed below, the meaning of that term in the statute is less than clear; however, if plaintiff's basic premise is correct, the existence of the specific power to condemn existing facilities would be helpful in determining whether the legislature intended "municipality" to include PUDs, given the popular support for PUDs that existed in the 1930s when an initiative measure was adopted to add section 12 to Article XI of the Oregon Constitution to authorize their establishment.

We have little to guide us in attempting to divine whether the 1931 legislature intended to grant PUDs authority to take by condemnation existing power generating facilities of private utilities. We start with an examination of the provisions added to the constitution in 1931 by section 12:

"People's Utility Districts may be created of territory, contiguous or otherwise, within one or more counties, and may consist of an incorporated municipality, or municipalities, with or without unincorporated territory, for the purpose of supplying water for domestic and municipal purposes; for the development of water power and/or electric energy; and for the distribution, disposal and sale of water, water power and electric energy. Such districts shall be managed by boards of directors, consisting of five members, who shall be residents of such districts. Such districts shall have power:

"* * * * *

"(e)    To exercise the power of eminent domain.

"(f)    To acquire and hold real and other property necessary or incident to the business of such districts.

"(g)    To acquire, develop, and/or otherwise provide for a supply of water, water power and electric energy.

"Such districts may sell, distribute and/or otherwise dispose of water, water power and electric energy within or without the territory of such districts."

Those provisions are not self-executing; legislative action was

---

[1] Or Laws 1931, ch 67, § 21.

required to carry out the authority they granted. *People's Util. Dist. et al v. Wasco Co. et al,* 210 Or 1, 305 P2d 766 (1957). Enabling legislation was enacted in 1931 and is now found in ORS ch 261. Included in that legislation was the authority of PUDs

> "[t]o exercise the power of eminent domain for the purpose of acquiring *any property,* within or without the district, *necessary* for the carrying out of the provisions of this chapter." ORS 261.305(5). (Emphasis supplied.)

Plaintiff argues that "any property" means exactly what it says, so long as the property acquired is within the statutory objective of a PUD, which is:

> "* * * [T]o develop the water and energy resources of this state for the benefit of the people of this state and to supply public utility service, including water, water power and electric energy for all uses and users." ORS 261.007.

That proposition, however, is too broad. The statutory authority is to condemn any property *necessary* for carrying out the provisions of the chapter, which is consistent with the authority to exercise the power of eminent domain. However, it is less broad than the constitutional authority to *acquire* (as distinguished from condemn) property "necessary or incident to" the PUD's business. It is at best questionable whether the taking of an existing private utility's hydroelectric project already devoted to public use is necessary to carry out the provisions of the chapter, although it may be convenient or incident to carrying them out and although such facilities may be acquired by voluntary purchase. Given the rule that the power to condemn land already appropriated to public use must be in express terms, *Little Nestucca Road Co. v. Tillamook Co.,* 31 Or 1, 48 P 465 (1897), we are not persuaded, without more, that ORS 261.305(5), either expressly or by necessary implication, grants PUDs authority to condemn existing hydroelectric facilities of private utilities.

Plaintiff, however, argues that there is more, because the statutory history of the condemnation provision of ORS ch 261 after its original enactment makes it clear that PUDs do possess that power. As originally enacted, ORS 261.305(5) provided, in addition to the language quoted above:

> "In any action or proceeding in eminent domain brought

by any district under the provisions of this act, such action or procedure shall be the procedure provided for by the laws of this state for the condemnation of real property, water, water rights and other property for the use of the public by the state and any subdivision thereof * * *." Or Laws 1931, ch 279, § 29.

In 1939, that statute was amended by adding the following provision to the language just quoted:

"[P]rovided, that in any such action or proceeding in eminent domain, such district may, *except as to the property of any other public or private utility,* take immediate possession of any property, or the use of any property required by such district, by depositing with the court such sum of money as the court, on ten days' notice to the adverse party, may deem reasonably adequate to secure the owner of the property sought to be taken." Or Laws 1939, ch 387, § 2. (Emphasis supplied.)

Plaintiff argues that the emphasized language indicates that the 1939 legislature thought that PUDs had authority to condemn such property; otherwise that language would have been unnecessary.

That conclusion is buttressed, it argues, by the fact that in 1941 the 1939 language was changed to read:

"[P]rovided, that in any such action or proceeding in eminent domain, such district may take immediate possession of any property, or the use of any property required by such district, by depositing with the court such sum of money as the court, on 10-days' notice to the adverse party, may deem reasonably adequate to secure the owner of the property sought to be taken; provided further, that the district shall not, before the satisfaction of any judgment in such action or proceeding in eminent domain, take possession of *any property of any other public or private utility, save and except that a district,* upon the conditions hereinbefore set forth, *shall have the right to take immediate possession of an easement to cross above or below an existing transmission or distribution line of such other utility and/or of property of such other utility which may not be used or useful in public service."* Or Laws 1941, ch 287, § 2. (Emphasis supplied.)

Again, that amendment presupposes the power of PUDs to condemn property of any other public or private utility. However, neither the 1939 nor the 1941 amendments,

either expressly or by implication, authorized the condemnation of an *existing power generating facility* owned and operated by a public or private utility and devoted to public use. The most that can be said is that those amendments recognize the authority of PUDs to condemn property of a public or private utility not dedicated to a public use. We think that the original statute, without either of the amendments, would have authorized that; it is the taking by condemnation of an existing hydroelectric project devoted to public use that is in question. The effect of the 1939 and 1941 amendments was to put restrictions on a PUD's right to take possession of the property of public or private utilities that they were authorized to condemn; neither amendment granted additional condemning authority.

█ As a general proposition, the legislature may empower a public body to appropriate private land already devoted to a public use; however, a general power of eminent domain is not sufficient to authorize such a taking. As stated above, that authority must be granted expressly or by necessary implication. *Little Nestucca Road Co. v. Tillamook Co., supra.*

█ The court in *Little Nestucca* enunciated principles of eminent domain that are now well established: government agencies may condemn only pursuant to power delegated from the sovereign and may not, without specific statutory authorization, take property already devoted to a public use if the taking would destroy or interfere with the public use. *See State v. Mohler et al,* 115 Or 562, 577, 237 P 690, 239 P 193 (1925); 1 Nichols, *Law of Eminent Domain,* § 2.2 (rev 3d ed 1980). *Little Nestucca* extended that principle to cases where there is no interference with the former public use, because the same use was planned after the taking. Other jurisdictions have held that the property of private corporations may be taken by a public corporation for the same use, but only when that action is authorized by a statute which specifically names the project to be taken, or which specifically authorizes the taking of property already subject to a public use. *See* 1 Nichols, *Law of Eminent Domain, supra,* § 2.2(9). A privately owned facility generating power for public consumption constitutes a public use. *See City of Pryor Creek v. Public Service Co. of Okl.,* 536 P2d 343, 346 (1975).

*Little Nestucca* was decided in 1897, long before the creation of PUDs was authorized. The legislature apparently was aware of the restrictive rule laid down in that case when it enacted in 1917 what is now ORS 545.082(2), relating to irrigation districts. That statute provides, in part:

> "The property, the right to condemn which is hereby given, shall include property already devoted to public use which is less necessary than the use for which it is required by the district * * *." Or Laws 1917, ch 357, § 31.

We must assume that the 1931 legislature was aware of the proper manner of granting authority to a governmental entity, other than the state, to take property already devoted to a public use when it enacted the forerunner of ORS 261.305(5) without including similar language. *See Sunshine Dairy v. Peterson,* 183 Or 305, 326, 193 P2d 543 (1948).

Thus far our analysis has been based on the assumption that the property to be condemned would be subjected to the same use after condemnation so that there would be no interference with its previous public use. However, it is by no means clear that condemnation by a PUD of a private utility's existing power generating facilities would have that result. Even though the PUD continues to operate the facilities to generate electricity, it might destroy or interfere with the present public use of a generating plant outside the borders of the district if that plant had been serving consumers who do not reside in the district and who may be cut off. Unlike the takeover provisions in ORS 543.610(1), the condemnation provisions in ORS 261.305(5) do not require a PUD to assume existing power supply contracts. That problem would not exist if the property taken, although owned by another utility, is not developed and devoted to an existing public use. That distinction is a compelling reason to conclude that, even if PUDs have authority to condemn the latter property, they do not have the power to condemn the former in the absence of specific statutory authorization. *State v. Mohler et al, supra;* 1 Nichols, *Law of Eminent Domain, supra,* § 2.2.

■ Given what we have said about the general condemnation power granted to PUDs under ORS 261.305(5), we conclude that PUDs are not granted express authority to take existing public or private power generating facilities dedicated to public use. Neither does that authority arise by necessary

implication. The language on which plaintiff relies, contained in the 1939 and 1941 amendments to the statute, does not grant any authority not contained in the original statute. Even if it did, it has been repealed and any power it granted no longer exists.[2] Further, the argument that the 1939 and 1941 legislative assemblies, in adopting those amendments, *thought* that the 1931 legislature intended to authorize PUDs to take existing public or private power generating facilities is no more persuasive than is the proposition that the 1971 legislature that deleted the 1941 language thought that the 1931 legislature did not intend that PUDs have that authority. *See Fred Meyer v. Bureau of Labor,* 39 Or App 253, 262, 592 P2d 564, *rev den* 287 Or 129 (1979).

We conclude that "any property" as used in ORS 261.305(5) is limited by the principle laid down in *Little Nestucca Road Co. v. Tillamook Co., supra,* and is not specific enough to authorize by necessary implication the condemnation by a PUD of an existing generating facility currently serving the public.

Notwithstanding our conclusion that PUDs do not have authority under ORS 261.305(5) to condemn defendant's existing power generating facilities, the question remains whether a PUD has that authority under *former* ORS 543.610, which appears to be the exclusive means[3] of condemning an existing generating facility. The initial question is whether a PUD is a municipality within the meaning of that statute. The word "municipality" may be, and has been, used in both a broad sense and a restricted sense. The scope of its meaning depends on the context in which it is used. *Rose v. City of Portland,* 82 Or 541, 162 P 498 (1917).

---

[2] Or Laws 1971, ch 741, § 38.

[3] We note that, in 1930, the attorney general had rendered an opinion that a city had authority to take by condemnation existing water power projects under a statute that was more specific than the later one granting PUDs authority to condemn. 14 Op Att'y Gen 620 (1930). Whether that opinion is correct in the light of *Little Nestucca Road Co. v. Tillamook Co., supra,* is at least questionable. However, as the present attorney general points out in his opinion, 41 Op Att'y Gen 335, 339, 345 (1981), it was generally thought, by virtue of the earlier attorney general's opinion, that cities and towns already had the power to condemn existing generating facilities, and the concern was whether the state had that power. The later opinion surmises that a principal purpose of the 1931 statute was to provide the exclusive authority for the state, cities and towns to take over existing facilities.

Again, we start with the constitutional underpinning for the creation of PUDs, Article XI, section 12:

"Peoples' Utility Districts may be created of territory, contiguous or otherwise, within one or more counties, and may consist of an incorporated municipality, or municipalities, with or without unincorporated territory * * *."

It is clear that section 12 distinguishes PUDs from municipalities. A PUD may be created of one or more municipalities and may include unincorporated territory. If a PUD is created to consist of one municipality, there are two separate and distinct legal entities, each of which has different authority over the same territory.

Although that distinction was made by the people through the initiative process, not by the legislature, there is no reason to believe that the legislature would ignore that distinction in enacting legislation relating to PUDs. In fact, it did not. Oregon Laws 1931, chapter 279, section 2, defined a PUD to be "an incorporated people's utility district, created under the provisions of this act." It defined a municipality to be "an incorporated city or town with a council or legislative body." Those definitions remain in ORS 261.010(1) and (2). Although PUDs are more accurately described as quasi-corporations, they are municipalities within the meaning of *former* Article IV, section 1a, of the Oregon Constitution, because that term is used in that section in a "broad and comprehensive sense." *Wasco County PUD v. Kelly,* 171 Or 691, 698, 137 P2d 295 (1943). We reiterate that the question is how "municipality" is used in a given context.

The forerunner of ORS 543.610 (Or Laws 1931, ch 67, § 21) was enacted as part of a larger statutory scheme relating to water power resources of the state and was patterned after the Federal Water Power Act. It is clear that, when the legislature enacted chapter 67, it recognized the existence of the newly authorized PUDs. The act originated as SB 62. Section 7 of the Federal Water Power Act, 16 USC § 800(a), granted a preference to "states and municipalities" in the issuance of licenses. That act defined municipalities to include any "political subdivision or agency of a state." 16 USC § 796(7). The state's parallel preference clause in SB 62 was

section 9,[4] which, as introduced, gave a preference to "a municipal corporation." That section was amended by the Senate to add the phrase "or public utility district." *See also* section 37.[5]

It is noteworthy that, having PUDs clearly in mind and having granted them a preference in section 9 by amendment to the original bill, the legislature did not amend section 21 to include PUDs. When the legislature uses different terms in related statutes, it is presumed that different meanings were intended. *State v. Crumal,* 54 Or App 41, 45, 633 P2d 1313 (1981). Furthermore, the last sentence of section 21, now ORS 543.610(2), provided:

> "* * * In addition to the foregoing there hereby is expressly reserved to the state, and any municipality thereof, the right to take over all or any part of any such project by condemnation proceedings as may be provided by the laws of Oregon or the charter of any such municipality."

The reservation of the right to condemn existing facilities to any municipality as may be provided by "the charter of any such municipality" appears to limit the meaning of municipality in section 21 to cities and towns, the organic law of which is a charter. *Davidson Baking Co. v. Jenkins et al,* 216 Or 51, 337 P2d 352 (1959).

Plaintiff contends that the difference in language is the result of sloppy drafting, as evidenced by the use of *"public utility district"* in section 9, rather than *people's* utility district, the correct name. It also points to the fact that in section 10,[6] which also grants a preference to municipal corporations, the language was not amended to include PUDs specifically, although, plaintiff contends, it is inconceivable that the legislature intended to grant a preference in one case and not the other. The preferences, however, are different. Section 9 grants a preference in the issuance of a license after a preliminary permit has been granted under the act to another, on the condition that the one exercising the preference reimburse the holder of the preliminary permit for certain expenditures. The section 10 preference applies to "any application

[4] ORS 543.260.

[5] ORS 543.150.

[6] ORS 543.270.

for the use of water made by any municipal corporation of this state *under any law of the state,* before a preliminary permit is issued hereunder, or before a license is issued hereunder when no preliminary permit upon the proposed project has been issued * * *." (Emphasis supplied.) That preference appears to be broader than that granted by section 9, and it is not inconceivable that the legislature would have limited it to municipalities.

Plaintiff places major emphasis on the language of section 37 of the original act:

> "The provisions of this act shall not apply to cities, towns or other municipal corporations of this state, including utility districts organized under article XI of the constitution of Oregon, as amended at the general election held November 4, 1930, and legislation enacted thereunder; saving, however, to said cities and towns and other municipal corporations the rights and preferences specified in sections 9, 10 and 21 hereof; provided, however, that the commission shall exercise *the powers in relation to such utility districts as may be* conferred upon it by any legislation providing for the creation of such utility districts." Or Laws 1931, ch 67, § 37.

Plaintiff argues that that section expressly includes PUDs within the meaning of the phrase "other municipal corporations" and then expressly saves to those "other municipal corporations" the rights and preferences specified in the enumerated sections, including the one involved here. Accordingly, it argues, it must be construed to provide that the listed entities *have* the rights specified in the three statutes listed.

Although the argument appears, at first blush, to have some merit, we are not persuaded that that language adds anything to section 21. Our first observation is that that section is not one granting authority. The first phrase is an exclusion from the application of the chapter; it expressly excludes PUDs from its application. Without more, there would be no question but that PUDs would be excluded from the benefits granted by ORS 543.610. The second phrase saves to the enumerated entities any rights and preferences specified in the three sections. It does not say that all of the entities *have* rights and preferences under each of those sections. Specifically, PUDs are granted a preference under section 9 (now ORS 543.260); that preference is saved to them,

notwithstanding their general exclusion from the application of the chapter. We do not believe that ORS 543.150 clarifies the meaning of ORS 543.610; neither does legislation enacted after 1931, on which plaintiff relies.

Oregon Laws 1945, chapter 205, section 1, required a vote of the people before PUDs could *acquire* distribution facilities beyond their boundaries. That provision, now ORS 261.315, does not relate to *condemnation;* it was simply an effort to make sure that such acquisitions could not take place without a vote of the people in the area affected. In 1967, the legislature passed ORS 261.250(2), which provides that a PUD may not condemn an existing thermal power plant. The legislative history of that statute is not enlightening and can be read to mean that, *if* PUDs had authority to condemn existing power generating facilities, that authority could not be used to take an existing thermal power plant.

In 1981, the attorney general released an opinion that concluded, although it expressed some uncertainty, that there was neither condemnation nor takeover power in a PUD for existing generation facilities. After that opinion was issued, the 1981 legislature enacted a two-year moratorium on condemnation by any PUD of a then existing hydroelectric power plant located outside its district. In committee, Representative Anderson, one of two representatives who had requested the attorney general's opinion, said that the intent of the legislation was to prevent litigation over whether the attorney general's opinion was correct. It was his intent to "lock the door."[7] The record of that committee meeting reveals the committee's awareness that the attorney general's opinion that they were reinforcing was based on the conclusion that a PUD was not a municipality. An intent to prevent litigation over the correctness of the attorney general's opinion is also evidenced in the record of the conference committee and the Senate floor discussion of the bill imposing the moratorium.[8] There it was said that the attorney general's opinion, if not supported by the legislature, would lead to many years of litigation and to higher costs for consumers. It was also said that the 1967 prohibition against acquiring

---

[7] Minutes, Conference Committee, July 23, 1981, p 2.

[8] Minutes, Conference Committee, July 31, 1981; Senate tape 29, July 17, 1981.

existing thermal facilities needed to be paralleled with a prohibition against takeover litigation connected with hydroelectric plants.

Although both House and Senate floor debates show some confusion and doubt as to whether an existing condemnation power was being limited,[9] it was clear in both chambers that the final action in passing the bill supported the attorney general's conclusion.[10] The issue was whether the legislature should confirm the attorney general's opinion, and it did so. Although the moratorium, by its own terms, was repealed on July 1, 1983, the 1981 legislature is on record as having agreed with and reinforced the conclusion reached by the attorney general.

The 1981 legislature took similar preventive action with respect to districts other than PUDs, providing in ORS 543.675 that such other districts could not use the power of condemnation to acquire hydroelectric facilities. The legislative history shows that the general purpose of that statute was to make sure that any condemnation power possessed by irrigation and other districts would not be expanded to permit the taking of hydroelectric facilities by implication. It was repeatedly stated in committee that such a power did not exist unless it was expressly granted, but that the statute would be passed anyway to avoid any question.[11] The 1981 legislature also passed ORS 543.660, which clearly distinguishes between municipalities and people's utility districts, which is further evidence that the 1981 legislature approved of the distinction on which the attorney general's conclusion was based.

In 1983, the legislature amended ORS 543.610(1) to provide that acquisition of water projects under that statute would require payment of "just compensation" rather than "net investment costs." The main purpose of that change was to resolve doubts about the constitutionality of requiring

---

[9] House tape 39; Senate tapes 235B; 236B, August 1, 1981.

[10] One senator who opposed the measure explained his vote by saying that it was unreasonable to use legislation to correct an individual PUD action that the legislature did not like, although he personally felt that Emerald had overreached in seeking to acquire an existing hydroelectric plant outside of its boundaries. Another senator explained his opposing vote by saying that the attorney general's opinion was unreasonable.

[11] Minutes, Senate Subcommittee on Energy, May 21, 1981, p 3; May 27, pp 1, 2.

payment of less than just compensation in order to encourage development of small hydroelectric projects and to prevent unfairness, including that perceived in the proposed takeover by Emerald.[12] If these later legislative actions have any significance, it is that they neutralize any effect of assumptions that might have been made by the legislature in 1939, 1941, 1945 and 1967.

■■ Our analysis leads us to the general conclusion that it is highly doubtful that the legislature in 1931 intended to include PUDs within the meaning of the word "municipality" in ORS 543.610. Certainly, it did not expressly include them. We interpret *Little Nestucca Road Co. v. Tillamook Co., supra,* to require that, not only must the power to condemn property already devoted to a public use be granted with specificity, it must also be granted expressly to the entity that seeks to exercise it. The statute here involved fails in the latter respect. There was no error in granting defendant's motion to dismiss.

Affirmed.

---

[12] Minutes, Senate Committee on Energy, June 15, 1983, pp 2-4; June 27, 1983, p 5.