Argued and submitted May 20, reversed and remanded on first claim and affirmed on second claim October 21, 1987, reconsideration denied on appellant's petition and granted on respondent's petition February 10, 1988
See 89 Or App 366 (1988)

PACIFICORP,
dba Pacific Power & Light Company,
*Appellant,*

*v.*

CITY OF ASHLAND,
*Respondent.*

(86-0553-J-1; CA A41718)

744 P2d 257

Joyce Ann Harpole, Portland, argued the cause for

appellant. With her on the briefs was Stoel, Rives, Boley, Fraser & Wyse, Portland.

Donald R. Stark, Portland, argued the cause for respondent. With him on the brief were Barry L. Adamson and Williams, Fredrickson, Stark & Weisensee, P.C., Portland.

Timothy J. Sercombe, and Harrang, Long, Watkinson & Arnold, P.C., Eugene, filed a brief *amicus curiae* for City of Eugene.

Charles N. Fadeley and Fadeley & Fadeley and Richard W. Butler and Atherly, Butler & Burgott, Eugene, filed a brief *amicus curiae* for Oregon Rural Electric Cooperative Association.

Kathleen M. Poole, Monmouth, filed a brief *amicus curiae* for League of Publicly Owned Electric Utilities of Oregon.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

RICHARDSON, P. J.

Deits, J., dissenting in part; concurring in part.

**RICHARDSON, P. J.**

Plaintiff brought this action for declaratory and injunctive relief against the defendant city. It contends in its first claim that the city has unlawfully provided electric service to customers who reside both within the city and within areas that, before the city annexed them, the Public Utility Commissioner (PUC) had allocated to plaintiff as an exclusive service territory, pursuant to ORS 758.400 to 758.475. In its second claim, plaintiff contends that the city has no condemnation authority over property of plaintiff located within the city and used by plaintiff in connection with its utility service to customers, which the city intends to acquire and put to the same "public use" as plaintiff now does. Both parties moved for summary judgment on both claims. The trial court denied plaintiff's motions, allowed the city's and entered a judgment declaring the parties' rights accordingly. Plaintiff appeals and assigns error to the rulings on the motions for summary judgment. We reverse and remand on the first claim and affirm on the second.

■ ORS 758.400 to 758.475 gives the PUC authority to allocate service territories exclusively, under defined circumstances, to providers of utility services. The areas in question were allocated to plaintiff by a 1962 PUC order, as modified by a 1965 order. The city has since annexed the areas and, between 1965 and the present, has constructed distribution facilities and provided electric utility service in them. Plaintiff argues that the city's doing so violates the territorial allocation statutes. ORS 758.450(2) provides that, after territory has been allocated to a "person," under circumstances of the kind present here, "no other person shall offer, construct or extend utility service in or into an allocated territory." ORS 758.400(2) defines "person" to include municipalities. However, ORS 758.470 reserves certain municipal powers and, in certain ways, restricts the application of the allocation statutes to cities. It provides:

> "(1) ORS 758.015 and 758.400 to 758.475 shall not be construed or applied to restrict the powers granted to cities to issue franchises, or to restrict the exercise of the power of condemnation by a municipality; and when a municipality has condemned or otherwise acquired another person's equipment, plant or facilities for rendering utility service, it shall

acquire all of the rights of the person whose property is condemned to serve the territory served by the acquired properties.

"(2) ORS 758.015 and 758.400 to 758.475 shall not be construed to restrict the right of a municipality to provide utility service for street lights, fire alarm systems, airports, buildings and other municipal installations regardless of their location.

"(3) ORS 758.015 and 758.400 to 758.475 shall not be construed to confer upon the commissioner any regulatory authority over rates, service or financing of cooperatives or municipalities."

The city argues that those reservations, together with the affirmative authority conferred on cities by ORS 221.420(2)(a), 223.005, 225.020 and 225.030, give it the right to provide service to customers in the incorporated portions of the territory allocated to plaintiff. ORS 221.420(2)(a) provides that every city may:

"Determine by contract or prescribe by ordinance or otherwise, the quality and character of each kind of product or service to be furnished or rendered by any public utility, furnishing any product or service within such city, and all other terms and conditions upon which any public utility may be permitted to occupy the streets, highways or other public property within such city and exclude or eject any public utility therefrom."

ORS 223.005 provides:

"Any incorporated city may:

"(1) Appropriate any private real property, water, watercourse and riparian rights to any public or municipal use or for the general benefit and use of the people of the city, including but not limited to appropriation for an aviation field, park, city hall, city buildings, jail, or to protect the city from overflow by freshets.

"(2) Appropriate any real property, water, watercourse and water and riparian rights, including power sites, to any public or municipal use or for the general benefit and use of the people within or without the city, and to build dams, reservoirs and conduits for the purpose of storing and using water to aid in developing the necessary power to generate electricity for the use and benefit of the people within or without the city.

"(3) Condemn for its use private property for the purpose of erecting and maintaining electric lines thereon for the purpose of generating and conveying power to light and heat the city, and to be used and sold by the city for manufacturing, transportation, domestic and other purposes, either within or without the corporate limits of the city, and for the purpose of constructing electrical systems for municipal uses."

ORS 225.020 provides:

"(1) When the power to do so is conferred by or contained in its charter or act of incorporation, any city may build, own, operate and maintain waterworks, water systems, railways and railroads, electric light and power plants, within and without its boundaries for the benefit and use of its inhabitants and for profit. To that end it may:

"(a) Acquire water systems and use, sell and dispose of its water for domestic, recreational, industrial, and public use and for irrigation and other purposes within and without its boundaries.

"(b) Build, acquire, own and operate railways operated by steam, electric or other power within and without its boundaries and running from such city to other towns, cities and points without its boundaries.

"(c) Acquire right of way, easements or real property within and without its boundaries for any such purpose.

"(2) In exercising such powers, any city may bring actions for the condemnation or taking of private property for public use in the same manner as private corporations are now authorized or permitted by law to do."

ORS 225.030 provides:

"Any city owning, controlling or operating a system of waterworks or electric light and power system for supplying water or electricity for its inhabitants and for general municipal purposes, and any person, persons, or corporation controlling or operating any water system or electric light and power system under contract, lease or private ownership, may sell, supply and dispose of water or electricity from such system to any person, persons, or corporation within or without the limits of the city in which the water or electric light and power system is operated, and may make contracts in reference to the sale and disposal of water or electricity from such system, for use within or without the corporate limits."

The territorial allocation statutes were first enacted

in 1961. Or Laws 1961, ch 691. Although the statutes on which the city relies have been amended in some particulars since that time, their origins predate those of the allocation statutes by many years, and they remain largely similar in substance to their original texts. The city argues that plaintiff incorrectly understands the allocation provisions as having impliedly repealed the statutes giving cities the authority to provide utility services and authority over utility providers. That understanding, according to the city, is not warranted by anything in ORS 758.400 to 758.475. Plaintiff responds that its argument is not based on the implied repeal thesis that the city ascribes to it; its argument is that the two statutory schemes are not in conflict and that the allocation statutes rather than those granting powers to cities are the relevant ones here. Plaintiff explains:

> "[Plaintiff's] first claim arose from the City's decision to annex and then invade electric service territory allocated exclusively to [plaintiff]. It did not arise from any action by the City to 'eject or exclude' [plaintiff] from that territory, as described in ORS 221.420(2). Certainly, the power to 'eject or exclude' a utility from city streets does not in itself include the power to *provide* utility service in place of the ejected or excluded utility. ORS 221.420 grants no authority to a municipality to itself provide utility service; that authority must come from some other statutory source. [Plaintiff's] first claim also did not arise from any effort by the City to condemn [plaintiff's] facilities in the annexed and invaded territory. The City's franchise and condemnation powers under ORS 221.420, ORS 223.005 and ORS 225.020 simply were never invoked in connection with its annexation and invasion of [plaintiff's] exclusive service territory and are not at issue with respect to [plaintiff's] first claim for relief.
>
> "In any event, the allocation statutes are not in conflict with those statutes. To the contrary, the allocation statutes expressly preserve whatever powers municipalities have to issue franchises and to condemn property. ORS 758.470(1). Whatever power cities may have to provide utility service to municipal installations also is expressly preserved by the allocation statutes. ORS 758.470(2).
>
> "What is at issue with respect to [plaintiff's] first claim is the asserted right of a municipality to provide utility service to nonmunicipal installations in territory allocated exclusively to another utility. The allocation statutes unequivocably deny any such right." (Emphasis plaintiff's.)

We do not necessarily agree with all of the particulars of plaintiff's argument. For example, we need not decide whether plaintiff is correct in implying that, if a city chooses to provide utility services *and* to "eject or exclude" a public utility from its allocated territory within the city, the allocation statutes would prevent the city from providing services in the territory from which it has ejected the exclusive provider. That is not the situation here. Plaintiff's overriding point is that, until December, 1985, when the city adopted the ordinance which authorized it to acquire or condemn certain property of plaintiff's (and which is the subject of plaintiff's second claim), the city exercised no regulatory or other authority under the statutes on which it relies; it simply began providing electric service in territory allocated exclusively to another provider.[1]

Assuming that the city is correct in its understanding of what each of those statutes authorizes and of how that authority would affect the operation of the territorial allocation statutes if it were exercised, the city is not correct in its view that its *unexercised authority* under the statutes is relevant to the question presented in plaintiff's first claim. The mere existence of those powers does not permit the city, acting in its capacity as a provider of utility services, to act in violation of the allocation statutes to which it is expressly subject in that capacity. The city has not exercised its authority to regulate plaintiff or to exclude plaintiff from its territory and, until December, 1985, the city had not condemned any of plaintiff's property. It was simply a competitor of plaintiff's, and it acted unlawfully by competing in any territory which was allocated exclusively to plaintiff. The trial court erred by granting the city's summary judgment motion on the first claim. We are unable to say, in the present posture of the case, whether plaintiff may be entitled to summary judgment on the

[1] Although the city's brief is not completely clear on the point, it appears to suggest that some or all of the annexed areas which it serves were not within the exclusively allocated territory at some or all of the times that the city has provided service to them. If that is the city's position, the most that could follow from it is that there is a material and unresolved question of fact, which would necessitate that we reverse and remand the summary judgment in the city's favor on the first claim. Because that disposition also follows under plaintiff's factual understanding, we assume its correctness in order to reach the legal issue which the parties dispute and which appears to have been the basis for the trial court's decision. The trial court of course must resolve any factual questions on remand.

claim. *See* note 1, *supra,* and note 3, *infra.* Further proceedings on the first claim are necessary.

Plaintiff's second claim challenges the city's December, 1985, ordinance authorizing the taking of certain property which is located in the city, owned by plaintiff and used by it in connection with providing electricity service. Plaintiff alleges that the city intends to use the property "for the purpose of providing electric power to residents" of the city. It contends that the city lacks authority to condemn property which is now used to provide electric utility services "in order to devote [the property] to the same use." We do not understand plaintiff to contend, and would not agree if it did, that ORS 223.005 and 225.020, individually or in combination, do not give the city *general* authority to condemn property and use it for municipally-provided electric utility services. *See also* Ashland City Charter, Article II, section 1; Article XI, section 1; *Davidson Baking Co. v. Jenkins et al,* 216 Or 51, 337 P2d 352 (1959). The point of plaintiff's argument is that the city cannot condemn property which is already committed to the public use for which the city seeks it, unless the authority to condemn the property for that purpose is expressly conferred by or can be necessarily implied from a statute or other authorizing source. *See Emerald PUD v. PP&L,* 302 Or 256, 729 P2d 552 (1986).

The parties focus principally on the provisions of ORS chapters 221, 223 and 225, quoted above, in their arguments about whether the city has express or implied authority to condemn plaintiff's property and use it to provide services of the kind for which it is now used by plaintiff. We think that the more relevant language is to be found in the territorial allocation statutes themselves. ORS 758.470(1) provides, in relevant part:

> "[W]hen a municipality has condemned or otherwise acquired another person's equipment, plant or facilities for rendering utility service, it shall acquire all of the rights of the person whose property is condemned to serve the territory served by the acquired properties."

Plaintiff states that ORS 758.470(1) "does not grant the power to condemn; rather, it simply preserves any condemnation power a municipality otherwise may be granted by law." We do not agree with that statement insofar as plaintiff

means by it that the quoted part of ORS 758.470(1) cannot constitute an express or necessarily implied grant of authority to condemn property for the purpose of providing electric utility services when the property is already being used for that purpose. It is correct that the language of ORS 758.470(1) which *precedes* the quoted language simply preserves unrestricted the franchise and condemnation powers which are conferred on cities by other statutes and sources of authority. That earlier language preserves, *inter alia,* the city's general authority under ORS 223.005(3) and ORS 225.020(2) to condemn property for its use in furnishing electricity service. The quoted language, however, does more than simply preserve authority which is granted to the city elsewhere; it independently authorizes a city which condemns the property of a public utility in an allocated territory to use the property to continue the utility service in that territory. The language—at the least—necessarily implies that a city may exercise its general power to condemn property, notwithstanding the fact that the property is being used to provide utility services, for the purpose of putting it to the same use as its prior owner did.[2]

*Amicus* Oregon Rural Electric Cooperative Association also maintains that ORS 758.470(1) cannot be the source of the city's authority to condemn existing utility property for municipal use in providing utility services. It explains:

> "[ORS 758.470(1)] refers to acquiring the rights of the person whose property is condemned to serve the 'territory' served by the acquired properties. Assuming the right to condemn existing utility properties for the same use, the reservation of any such right of condemnation refers only to 'territory served' and not to 'allocated territory' defined in ORS

---

[2] Although the point is outside the issues in this case, the ability of the condemning city to continue the displaced public utility's service is integral to the operation of the territorial allocation statutes. Both the conditions which must exist for there to be an exclusive territorial allocation, *see* ORS 758.405; 758.415; 758.440(2), and the fact that an exclusive provider was serving the territory before the taking, may make the continuation of service by the successor to the property essential to assure the availability of utility service in the territory. It is very possible that that is the reason why ORS 758.470(1) gives the condemning city the authority to replace the public utility whose property it condemns as the exclusive provider in an allocated territory. The same considerations may also explain why the territorial allocation statutes are at least more clear than the general municipal condemnation statutes in implying to the authority of cities to condemn public utility property for the purpose of providing the same service as the public utility used the property to provide.

758.400(1). Thus, there is no suggestion that there would continue to be a condemnation power, if any existed before, over facilities within an allocated territory."

The argument of *amicus* is incorrect. The subject of ORS 758.470(1) is the construction and application of ORS 758.015 and 758.400 to 758.475, the statutes governing exclusive territorial allocations. Given that, there is no possible substantive significance to the legislature's choice of the term "territory served" instead of "allocated territory." In the context of those statutes and in connection with territory which the PUC *has* allocated, both terms *can* only refer to that allocated territory. The only conceivable reason for the legislature's choice of the term "territory served" rather than "allocated territory"—if it thought about the matter at all—is that the phrase which would have resulted from the use of the latter term, *i.e.*, "acquire all of the rights of the person whose property is condemned to serve the *allocated territory* by the acquired properties," would have been totally meaningless. The trial court correctly concluded that the city has authority to condemn the property in question and to use it to provide electric service.

Reversed and remanded on first claim;[3] affirmed on second claim.

**DEITS, J.**, concurring in part; dissenting in part.

I agree with the majority that, in the present posture of the case, where it has not actually exercised its authority to regulate or exclude, the city is subject to and in violation of the allocation statutes when acting as a provider of utility services in territory allocated exclusively to plaintiff. It is necessary to remand the first claim for disposition of the factual disputes identified in the majority opinion. I do not concur with the majority's disposition of plaintiff's second claim because I do not agree that the city has condemnation authority over plaintiff's property that is devoted to a public use.

The power to condemn property for public use that is

---

[3] Whether our disposition of the second claim and the reasons which lead us to that disposition have any bearing on the first claim is for the trial court to consider on remand. The current status of the acquisition or condemnation, as well as the territorial relationship of the property the city plans to acquire to the allocated areas it has been serving, may be germane. *See also* note 1, *supra*.

already devoted to a public use must be granted expressly or by necessary implication by the legislature. *Little Nestucca Road Co. v. Tillamook Co.,* 31 Or 1, 48 P 465 (1897); *Emerald PUD v. PP&L,* 76 Or App 583, 591, 711 P2d 179 (1985), *aff'd* 302 Or 256, 729 P2d 552 (1986). This is a long held principle of common law. *See* 1 Nichols, *Law of Eminent Domain* § 2.2 (3d ed rev 1985); *City of Pryor Creek v. Public Service Co. of Okl.,* 536 P2d 343 (Okla 1975). In our *Emerald PUD* opinion, we held that the condemnation authority granted to a PUD in ORS 261.305(5) "[t]o exercise the power of eminent domain for the purpose of acquiring any property * * * necessary for the carrying out of the provisions of this chapter" was not specific enough under the *Little Nestucca* rule to authorize by necessary implication the condemnation of a PP&L generation facility that was serving the public. The Supreme Court reaffirmed the *Little Nestucca* principle but held that PUDs have the power, by necessary implication, to condemn existing facilities of the private utility. 302 Or 256, 729 P2d 552 (1986). The court found that the condemnation authority arose by necessary implication on the basis of the historical context, purpose and nature of the 1930 constitutional amendments authorizing creation of PUDs. 303 Or at 264.

The majority finds the authority for cities to condemn facilities currently devoted to public use in the PUC territorial allocation statute, ORS 758.470(1), which provides:

> "ORS 758.015 and 758.400 to 758.475 shall not be construed or applied to restrict the powers granted to cities to issue franchises, or to restrict the exercise of the power of condemnation by a municipality; *and when a municipality has condemned or otherwise acquired another person's equipment, plant or facilities for rendering utility service, it shall acquire all of the rights of the persons whose property is condemned to serve the territory served by the acquired properties.*" (Emphasis supplied.)

The majority agrees that the quoted language which precedes the emphasized language simply preserves existing authority but concludes that the emphasized language permits implication of condemnation authority.

A closer analysis of ORS 758.470(1) indicates that it is a source neither of express nor implied condemnation

authority; rather, the statute preserves condemnation authority that already exists. The subsection appears in a chapter dealing with utility regulation. It is at the end of the territorial allocation statutes, and it sets out how the preceding statutes are to be applied to municipalities. The first clause, unemphasized above, is the *reservation* of municipal franchise and condemnation powers. The second clause relates a municipality's exercise of those reserved powers to the operation of the territorial allocation statutes. It does not say that a municipality is granted such powers under the section; rather, it states "and when a municipality has condemned or otherwise acquired another person's equipment, plant or facilities * * *, it shall acquire all of the rights * * *." That does not necessarily imply a grant of authority. The language "when a municipality has condemned," set off from the main clause of the sentence, *presupposes* the power to condemn. Simply because the language of the section reserves or refers to certain authority does not mean that municipalities have necessarily been given that authority.

The conclusion that ORS 756.470(1) does not grant cities the authority to condemn property currently in public use does not render the language referring to condemnation powers meaningless. Utilities may own property which is not currently devoted to a public use. There may be occasions when a municipality, under the authority of its *general* condemnation power, would condemn utility property not currently devoted to a public use. In such an instance, the subsection ensures that the city is not precluded by the territorial allocation statutes from serving the territory previously served by the utility.

The purpose of the inclusion of the condemnation reference in ORS 758.470(1) appears to have been to placate the concerns of municipalities when the territorial allocation provisions were proposed that the PUC would usurp their authority. *See* Minutes, House Committee on Planning and Development (April 6, 1961—statement of League of Oregon Cities on SB 487). Cities did not want the territorial allocation provisions to apply to territory, utility service or facilities within city limits as they currently existed or were later extended. The testimony of then Public Utility Commissioner Hill confirms this apparent purpose. Assuming that some power of municipal condemnation existed, he stated that that

power would cease once the utility secured an allocation of territory from the PUC. Minutes of House Planning and Development Committee, April 6, 1961, p 3.

It was the usurpation of *existing* powers of municipalities that the section was intended to prevent. A fundamental consideration in statutory interpretation and application is the intent of the legislature. That intent should be discerned from the purpose the statute was enacted to serve, and the statute should be applied in accordance with that purpose. Here, both the language of the subsection and its legislative history indicate that its object was only to preserve and protect the *existing* powers of municipalities in the light of new territorial allocation authority granted to the PUC. The section was not intended to be a grant of condemnation authority, in particular not the *specific* authority to condemn property already devoted to a public use that the *Little Nestucca* principle requires. This statute, unlike the statute in *Emerald PUD v. PP&L, supra,* does not have a legislative history indicating that the authority may be necessarily implied.

The rule in *Little Nestucca* arises in the context of the evolution of the law of eminent domain and, given that context, it should be narrowly construed and applied. The power of condemnation is a significant attribute of sovereignty that requires no constitutional recognition. *Tomasek v. State,* 196 Or 120, 248 P2d 703 (1952). The Oregon Constitution does, however, impose limitations on that power; taking of private property must be for a public use and compensated. Or Const, Art I, § 18. The authority to condemn property for a public use remains dormant in the state until the legislature by specific enactment delegates it to a municipality or private corporation. *Little Nestucca Road Co. v. Tillamook Co., supra,* 31 Or at 6. The legislature has made general grants of authority to condemn but, when an entity wishes to condemn property for a public use and that property is already devoted to a public use, *Little Nestucca* tells us that it must sustain its claim by authority delegated in express terms or arising by necessary implication. A general delegation of condemnation authority is insufficient. The principle applies even when there is no interference with the former public use because the same use is planned after the condemnation. *Little Nestucca Road Co. v.*

*Tillamook Co., supra,* 31 Or at 6; *Emerald PUD v. PP&L, supra,* 76 Or App at 589.

The *Little Nestucca* principle represents a restraint on the delegation of condemnation powers. If the state is going to "change at pleasure its trustees and the object of its trust," it must do so clearly and expressly. *Little Nestucca Road Co. v. Tillamook Co., supra,* 31 Or at 6. Condemnation statutes are in derogation of vested rights and should be strictly construed. *Port of Umatilla v. Richmond,* 212 Or 596, 321 P2d 338 (1958). As this court noted in *Emerald PUD v. PP&L, supra,* 76 Or App at 589, other jurisdictions have held that the property of private corporations may be condemned by a public entity for the same use only when condemnation is authorized by a statute that specifically names the project to be condemned or that specifically authorizes the taking of property already subject to a public use. Finding such authority to exist by necessary implication must be done with restraint so as to recognize the limitation which the *Little Nestucca* principle was intended to impose on what is otherwise government's relatively unfettered power of condemnation.

The city argues that the authority to condemn is found in ORS 221.420, 221.450, 223.005 and 225.020. However, none of those statutes either expressly or by necessary implication grants the requisite authority. ORS 223.005(3) grants condemnation powers related to the provision of electrical services, but that power is limited to "the purpose of erecting and maintaining electric lines" to provide that service. It is not an express grant of authority to condemn property already devoted to a public use; it is a specific grant of condemnation power limited to the sites of power lines. If the legislature had intended to grant more condemnation authority than it did there, it is reasonable that it would have done so with less limited and specific language. The necessary authority does not arise from that statute by implication. The property that a municipality would need to condemn for the specific purposes may well be private property not currently devoted to a public use.

ORS 225.020(1) authorizes municipalities to "build, own, operate and maintain * * * electric light and power plants." For such purposes a municipality may "[a]cquire right of way, easements or real property * * *." ORS 225.020(1)(c).

In exercising those powers, a municipality may "bring actions for the condemnation * * * of private property * * *." ORS 225.020(2). That also appears to be no more than a general grant of condemnation authority, insufficient for condemning property already devoted to a public use.

In *Emerald PUD v. PP&L, supra,* 76 Or App at 587, we held that a similar grant of authority to PUDs to condemn "for the purpose of acquiring *any property* * * * necessary for the carrying out of the provisions of this chapter," ORS 261.305(5), neither expressly nor by necessary implication grants a PUD authority to condemn existing hydroelectric facilities of private utilities. The Supreme Court held that, in view of the constitutional amendments relating to PUDs, the other events surrounding enactment of the statutes and the provisions of the statutes themselves, the power of a PUD to condemn existing facilities devoted to public use arose by necessary implication. *Emerald PUD v. PP&L, supra,* 302 Or at 264. To hold otherwise, the court said, would have been contrary to the intent of the voters and the legislature. Here, there is no legislative history to suggest that the general grant of condemnation power in ORS 225.020(2) is anything more than it appears. Without express or necessarily implied authorization, the city may not condemn Pacificorp's facilities. Again, as noted *supra,* condemnation statutes are to be narrowly construed, because they derogate vested rights. We should strictly adhere to the *Little Nestucca* principle, because it is a limitation on an otherwise very broad governmental power. I would reverse the trial court's grant of summary judgment for city on plaintiff's second claim.

Accordingly, I concur in part and dissent in part.