Argued and first submitted November 1, 1983; supplemental memoranda requested April 24, submitted on supplemental memoranda May 17, affirmed August 21, 1984

PLANNED PARENTHOOD ASSOCIATION,
INC. et al,
*Respondents on Review,*

*v.*

DEPARTMENT OF HUMAN RESOURCES
OF THE STATE OF OREGON,
*Petitioner on Review.*

(CA A20856; SC 29722)

687 P2d 785

James E. Mountain, Jr., Deputy Solicitor General, argued the cause for petitioners on review. With him on the briefs were Dave Frohnmayer, Attorney General, William F. Gary, Solicitor General, and Virginia L. Linder, Assistant Attorney General.

Ruth Gundle, Oregon Legal Services Corp., and Stephen S. Walters, American Civil Liberties Union, argued the cause for respondents on review. With them on the briefs were Donna Meyer, Nancy Helget and Ira Zarov, Oregon Legal Services Corp.; Andrew R. Gardner, American Civil Liberties Union; Mary Klepser, Legal Advocacy for Women Fund; Pamela L. Jacklin and Susan P. Graber, Portland.

LENT, J.

## LENT, J.

This case was presented as a challenge based upon the Oregon Constitution to an administrative rule pursuant to ORS 183.400(4)(a). Promulgated by the Adult and Family Services Division (Division), the rule limits the availability of reimbursement for abortions within the state medical assistance program.

In addition to charging that the rule violates Article I, Section 20 of the Oregon Constitution, the individuals and public interest groups challenging the rule argued to the Court of Appeals that it violates an indigent woman's asserted "right to privacy" under the Oregon Constitution,[1] and that it violates religious freedom guarantees of the Oregon Constitution. The Division invoked the decision of the Supreme Court of the United States in *Harris v. McRae,* 448 US 297, 100 S Ct 2671, 65 L Ed2d 784 (1980), in which the court considered federal constitutional challenges to the Hyde Amendment similar to the state constitutional challenges raised by respondents herein. The Supreme Court's upholding of the Hyde Amendment is, according to the Division, persuasive authority that we should reject the constitutional challenges to the rule.

The Court of Appeals found that the rule violated the equal privileges and immunities clause of the Oregon Constitution (Article I, Section 20). *Planned Parenthood et al v. Department of Human Resources,* 63 Or App 41, 663 P2d 1247 (1983). We hold that this ruling and the constitutional challenge are premature.

This court follows the principle that constitutional issues should not be decided when there is an adequate statutory basis for a decision: *Douglas County v. Briggs,* 286 Or 151, 593 P2d 1115 (1979); *See State v. Lowry,* 295 Or 337, 343, 667 P2d 996 (1983), and cases there cited at n. 4. Pursuant to ORS 183.400(4)(b), we hold that the rule is invalid because it exceeds the statutory authority of the agency.

Upon review of an administrative rule under ORS 183.400(4):

---

[1] For the problematic character of such a claim, *see Sterling v. Cupp,* 290 Or 611, 625 P2d 123 (1981).

"The court shall declare the rule invalid only if it finds that the rule:

"(a)   Violates constitutional provisions;

"(b)   Exceeds the statutory authority of the agency; or

"(c)   Was adopted without compliance with applicable rulemaking procedures."

In the proper sequence of analyzing the legality of action taken by officials under delegated authority, the first question is whether the action fell within the reach of their authority, the question which in the case of courts is described as "jurisdiction." If that is not in issue, as it is not in this case, the question is whether the action was taken by procedures prescribed by statute or regulation. Assuming that proper procedures were followed, the next question is whether the substance of the action, though within the scope of the agency's or official's general authority, departed from a legal standard expressed or implied in the particular law being administered, or contravened some other applicable statute. These steps are designed to assure that the challenged action, particularly an action challenged for arguably violating constitutional rights, in fact was authorized by the state's or local government's politically accountable policy makers. Only if the action was clearly so authorized is there any reason to decide whether the state or local government has adopted a policy that the constitution forbids. *See generally State v. Harmon,* 225 Or 571, 577, 358 P2d 1048 (1961); *Wright v. Blue Mt. Hospital Dist.,* 214 Or 141, 144, 328 P2d 314 (1958); *Peninsula Drainage Dist. No. 2 v. City of Portland,* 212 Or 398, 418, 320 P2d 277 (1958); *Federal Cartridge Corp. v. Helstrom,* 202 Or 557, 565, 276 P2d 720 (1954). *See also Neuhaus v. Federico,* 12 Or App 314, 505 P2d 939 (1973).

The rule here at issue is OAR 461-14-052, which states:

"(1)   Payment will not be made for elective abortions performed except under the following conditions:

"(a)   Cases in which a physician, on the basis of his or her professional judgment, has certified in writing that the abortion is necessary because the life of the woman would be endangered if the fetus were carried to term.

"(b)   Cases other than in subsection (a) of this section:

"(A)  Payment may be made for one (1) elective abortion (in addition to an abortion in subsection (a) of this section) if the woman is 18 years of age or older and was receiving maintenance assistance from Oregon at the time determined by a physician that conception occurred. Payment may not be made under this paragraph if payment for an abortion has been made under paragraph (B) of this subsection.

"(B)  Payment may be made for two (2) elective abortions (in addition to an abortion listed in subsection (1)(a) of this rule) if the woman is 17 years of age or younger at the time determined by a physician that conception occurred and is otherwise eligible for medical assistance in Oregon.

"(2)  Payment will not be made for elective abortions unless prior authorized by the Division.

"(3)  Payment for elective abortions will be limited to abortions performed in a physician's office, clinic or outpatient surgery setting unless the physician specifically requests and justifies the need for hospitalization."[2]

The rule represents a reaction by the Division and the Emergency Board created by ORS 291.324 to the curtailment of federal funding for elective abortions resulting from passage of the so-called Hyde Amendment.

Since the liberalization of the state's abortion law in 1969, the Division's budget had included funds for elective abortions. Between 1972 and 1977 (the effective date of the Hyde Amendment), a large portion of the funds for this budget item came from the federal Medicaid program. Under the original Hyde Amendment the only abortions that could be paid for with federal funds are those resulting from rape or incest or those required because the mother's life is threatened.[3] The amendment left the states free to pay for elective abortions out of their own funds. *See Harris v. McRae, supra.*

---

[2] OAR 461-14-005(9) defined elective services for the purposes of the issue presented by this case as "those which are not considered emergency measures and which can usually be scheduled later or postponed indefinitely without having immediate serious adverse effect on the client's mental or physical health."

[3] What is commonly referred to as the Hyde Amendment is really an amendment to annual appropriations or joint resolutions which have since 1976 prohibited the expenditure of funds to reimburse the cost of abortions under the Medicaid program, except under specified circumstances which have varied somewhat from year to year.

In November of 1977 the Division submitted a request to the Emergency Board (see ORS 291.326 and Or Const, Art III, § 3 in Appendix to this opinion) for replacement funding for elective abortions. The Emergency Board did not act directly on this request. It postponed action on the proposal and directed the Division to develop restrictions for state funded abortions and to present those restrictions in the form of an amended proposal to the Emergency Board at a later meeting. After two more meetings, the Division announced proposed restrictions on the availability of abortions in order to induce a compromise among the Emergency Board members that would result in at least limited funding. The Emergency Board approved a modified written request for funding at a third meeting. The original request by the Division was for roughly 1.86 million dollars. It would have made up for all lost federal funds. The approved request was for $481,790. In effect, the Emergency Board conditioned funding upon its approval of the rule here in question. Plaintiffs went so far as to state in their brief to the Court of Appeals that "[t]his rule was a compromise promulgated by the Oregon Legislative Emergency Board at its February 4, 1978 meeting." (App Br 5.) Since the approval of the funding request, the rule has been amended several times by the Division without any direct intervention from the Emergency Board. The present rule's primary effect of limiting the availability of reimbursement for abortions for those covered under the program is substantially the same as when funding was first approved by the Emergency Board.[4]

Plaintiffs did not claim before the Court of Appeals or this court that the rule is invalid because it is in conflict with the purpose of the enabling legislation or that the rule is in that sense beyond the scope of the agency's authority. Nevertheless, in order to keep within the proper sequence of analysis for purposes of testing the validity of an administrative rule and to have a response by the parties to the court's concerns, the court propounded questions to be addressed by the parties. The court asked, "Is there any plausible doubt whether the rule at issue corresponds to legislative policy?"

---

[4] The original complaint challenged a version of the rule that allowed medical assistance for abortions in cases of rape or incest. That provision was deleted in July of 1981.

Before the Court of Appeals and at oral argument before this court, plaintiffs argued that the rule conflicts with legislative policy in order to show for purposes of constitutional analysis that the rule furthered no legitimate state interest. According to plaintiffs, the state medical assistance program is a comprehensive health maintenance scheme providing a wide range of health services to those who qualify as needy under the program. The system provides not only acute medical care but those services which are medically necessary and those which simply contribute to good health and health maintenance. Limitations on the availability of abortions as imposed by the rule under review conflict with the goal of offering complete health care.

The Division, in its Memorandum in Response, argued, on the other hand, that there can be no doubt that the rule is consistent with legislative policy because it was designed to meet the concerns of the Emergency Board. The parties are in agreement as to the history of the rule, and the accounts given by each demonstrate that the Division is correct in asserting that the rule is a product of the Emergency Board's concerns. Plaintiffs, in their brief to the Court of Appeals, stated:

"In this case, OAR 461-14-052 was adopted to implement funding decisions by Oregon's Emergency Board in 1977. The minutes of the Emergency Board meetings at which the Rule was considered, which are attached as Appendix, pp. 1-18, of this brief, demonstrate that it was motivated by pressure from persons concerned solely with opposition to abortion itself, and not any other state interests. *The compromise that ultimately was struck and which evolved into the rule challenged in this case is a direct result of the anti-abortion sentiments of several members of the Emergency Board.*" (Emphasis added.)

The Division stated in its Memorandum in Response to the question that:

"The Department of Human Resources' written funding request * * *, Linda Kaeser's testimony * * *, and the Executive Department's written analysis of the request * * * demonstrate unequivocally that the *agency's policy choice was to continue the full funding* of elective abortions by replacing lost federal revenues with a state general fund allocation. Although, as we discussed in our respondent's brief to the

Court of Appeals * * *, the agency has considerable discretion to determine the type of medical benefits to be provided under Oregon's Medicaid program, that discretion is controlled by the state and federal appropriations power. The Oregon *legislature chose to exercise full control over the policy choice* at issue in this case." (Emphasis added.)

What the Division is calling the legislature is, however, the Emergency Board.

The Division also argued in its Memorandum in Response that the challenged rule implements policies expressed in the enabling legislation. In support of this argument, the Division adverts to that part of the enabling act expressing the aim of qualifying the Oregon assistance program for maximum federal funding from Medicaid. The Division also disputes plaintiffs' contention that the program is intended to be comprehensive. The Division observes that ORS 414.065(1) restricts medical assistance under the program to the limits of available funds.

We disagree with the Division. That an administrative rule was approved by the Emergency Board, or that it is in harmony with the views of individual Emergency Board members, does not mean that the rule accords with legislative policy. The Emergency Board is not the legislature. The responsibility to decide, within the statutory policies, what types of medical services are to be provided by the state medical assistance program was conferred by the legislature upon the Division in ORS 414.065(1)(a) as follows:

"(1) With respect to medical and remedial care and services to be provided in medical assistance during any period, and within the limits of funds available therefor, the Adult and Family Services Division shall determine, subject to such revisions as it may make from time to time:

"(a) The types and extent of medical and remedial care and services to be provided."

Nothing in the Oregon Constitution or the statute describing the powers of the Emergency Board gives the Emergency Board supervisory power over decisions that the agency is authorized by statute to make. *See* Appendix. Neither the constitution nor the statute conferring the Emergency Board's powers ascribe to it a legislative function.

The powers of the Emergency Board are to allocate emergency funds and to amend the budgets of state agencies so as to allow transfers between expenditure classifications within the budget of an agency. The Emergency Board may exercise these powers only in the interim between sessions of the Legislative Assembly. ORS 291.326.[5]

The law as to what government entity has the responsibility to determine the types of medical services to be provided by the state medical assistance program was expressed by the legislature in ORS 414.065(1)(a). The standards guiding that authority are the policies expressed by the legislature in the enabling act, aided by a requirement of that act expressed in ORS 414.225 that the Division must consult with a medical advisory committee established under the act in determining services to be provided under the program.[6]

As for the argument that the rule positions the state medical assistance program for optimum federal funding, there is no indication in the Hyde Amendment or any other law cited by the Division that restrictions on state funding for abortions are in any way necessary for receipt of full funding from Medicaid. *Harris v. McRae, supra,* indicates that this contention is wrong. Moreover, the Division's argument that the statutory directive to limit the provision of services to take account of available funding prevents the program from being

---

[5] *See* Appendix.

[6] In dealing with a somewhat similar problem to the difficulties posed by the actions of the Emergency Board in this case, the Supreme Court of the United States recently struck down the single house legislative veto in *INS v. Chadha,* 462 US 919, 103 S Ct 2764, 77 L Ed2d 317 (1983). One passage is particularly illustrative of the constitutional issues posed by the Emergency Board's actions:

"Since it is clear that the action by the House under § 244(c)(2) was not within any of the express constitutional exceptions authorizing one House to act alone, and equally clear that it was an exercise of legislative power, that action was subject to the standards prescribed in Article I. The bicameral requirement, the Presentment Clauses, the President's veto, and Congress' power to override a veto were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps. To preserve those checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded. To accomplish what has been attempted by one House of Congress in this case requires action in conformity with the express procedures of the Constitution's prescription for legislative action: passage by a majority of both Houses and presentment to the President." (Footnotes omitted)

103 S Ct at 2787.

comprehensive is not well taken. The program may provide a complete range of medical services while responding to funding limitations by tightening eligibility rquirements in terms of need and income level.

We conclude, upon review of the legislation creating the Oregon Medical Assistance Program, that the legislature intended to provide medical assistance to those most in need and to help contain health care costs. ORS 414.036(2) states:

"In order to provide access to health care for those most in need, to contain rising health care costs through appropriate incentives to providers, payers and consumers and to promote the stability of the health care delivery system and the health and well-being of all Oregonians, it is the policy of the State of Oregon to provide medical assistance to those in need and eligible for benefits under the program authorized by this chapter."

The standard that the Division must use for determining need and the amount of aid to be available is given in ORS 414.042 as follows:

"(1) The need for and the amount of medical assistance to be made available shall be determined, in accordance with the rules of the Adult and Family Services Division, taking into account:

"(a) The requirements and needs of the person, his spouse and other dependents;

"(b) The income, resources and maintenance available to the person;

"(c) The responsibility of his spouse, and, with respect to a person who is blind, or is permanently and totally disabled, or is under the age of 21 years, the responsibility of the parents; and

"(d) The conditions existing in each case.

"* * * * *"

Although the terms in which this standard is expressed indicate that it is meant to apply to individuals eligible for medical assistance, it is clear that the standard is also an elaboration by the legislature of the purposes set forth in ORS 414.036(2).

As previously stated, the Division has the responsibility to determine the types and extent of medical services to

be provided under the program pursuant to ORS 414.065(1)(a). That responsibility, however, is not a carte blanche delegation of authority. It is delegated in order to carry out the objectives and standards contained in ORS 414.036(2) and ORS 414.042. Those statements are necessarily broad and general. The legislature did not enact a detailed catalogue of medical services and a corresponding formula for calculating financial eligibility. That is an understandable choice, especially considering the additional variable of available funds.

Nonetheless, it is not difficult to discern the legislative policy and the criteria that are relevant to the administration of that policy. Within the funds available, the statute requires the Division to consider two variables. One is "[t]he need for * * * medical assistance to be made available." The other variable is the financial needs of the person seeking medical assistance, taking into account the person's resources, family requirements and the conditions of each individual case. Implicit in the statute is the obvious proposition that there is a scale or range of more or less urgent medical needs and a scale or range of financial need. The task delegated to the Division is to match these two variables in some order of priorities so as to determine what level of financial need makes a person eligible for part or all of the cost of covered types of health care.

Obviously, this leaves the Division a great deal of flexibility. The law does not prescribe a single formula for drawing a financial line, above which persons are eligible to receive paid medical services of all kinds and below which they receive none, as distinct from, perhaps, a sliding scale of assistance for different kinds of services. But it also does not leave the Division entirely free to distribute medical assistance by any method of its choice. For instance, the Division could not simply set an income level of eligibility and then hand out funds for any medical service of a person's choice on a first-come, first served, basis until its limited funds run out, disregarding the relative importance of different medical needs, without departing from the statutory policy to promote the health of "all Oregonians" and to "provide medical assistance to those in need and eligible."

The question, then, is whether OAR 461-14-052 corresponds to the statutory policy as we understand it. We think the rule does not do so in two respects. First, it assumes that a treatment or procedure ("elective" abortions as that term is used in the rule) is a medical need for which assistance is appropriate but then prescribes as a rigid rule that this need for assistance does not exist, or is less important, the second time it arises than the first. At least the rule assumes this, without regard to the current circumstances, if a woman was receiving maintenance assistance from Oregon at the time of conception. But, second, the rule makes no such assumption either about medical need or about disqualification by financial status if the woman is 17 years of age or younger at the time of conception.[7] We find it difficult to relate these arbitrary numerical rules either to the variable of medical need or to the variable of financial need implicit in the legislative program. Nor do we see how they allow for consideration of "[t]he conditions existing in each case," as commanded by ORS 414.042(1)(d). Rather, they strike us as a system for rationing one type of medical assistance without regard to either of the two variables or to conditions of need in individual cases.

■     To the extent that the rule departs from the statutory policy directive, it "exceeds the statutory authority of the agency" within the meaning of those words in ORS 183.400(4)(b). "Authority" in that section cannot be taken to mean only the overall area of an agency's authority or "jurisdiction," because that construction would leave rules open to substantive review only for constitutional violations under ORS 183.400(4)(a). In effect, such an interpretation would expand every official's rulemaking power on matters within his general assignment to the limits of constitutional law, whatever the legislative policy of the statute might be. It would contradict the well-established principle to avoid constitutional holdings until it is clear that the challenged policy indeed has been enacted into law by the politically responsible lawmakers, in this case the Legislative Assembly.

_____

[7] Read literally, the rule seems to make no provision for women between the ages of 17 and 18. It refers only to women 18 years of age or older and 17 years of age or younger. Perhaps the agency means that a 17 year old remains such until her 18th birthday.

We do not think this is what the legislature intended in enacting the "exceeds statutory authority" language of ORS 183.400(4)(b). Rather, we agree with that part of the Division's response to the same questions wherein the Division stated:

> "To resolve whether the challenged rule is within the statutory authority of the agency, this court need only determine whether the rule is within the range of discretion allowed by the more general policy of the medical assistance program statutes. *See Springfield Education Assn. v. School Dist.,* 290 Or 217, 229, 621 P2d 547 (1980)."

We hold that the Division's authority to determine the types and extent of medical services to be made available in the program is limited by the policies expressed in the enabling act. That statute states explicitly that the aim of the program is to provide services on the basis of need to individuals in the program and directs how need is to be determined. Under ORS 414.042(1) the only factors to be considered in determining such need are the requirements and needs of the individual, his or her income, the responsibility of his or her spouse, parent or guardian and individual circumstances. The rule at issue here is inconsistent with that directive. It arbitrarily limits the number of elective abortions a woman in the program may receive without regard to any of the factors that the enabling legislation requires the Division to consider. We, therefore, declare the rule to be invalid as being outside the authority of the Division.

The Division has authority under the statutes that we have cited to reconsider its rule after rulemaking procedures directed to the establishment of priorities for the provision of medical services.

The decision of the Court of Appeals is affirmed.

## APPENDIX

Article III, Section 3 of the Oregon Constitution states:

> "(1)  The Legislative Assembly is authorized to establish by law a joint committee composed of members of both houses of the Legislative Assembly, the membership to be as fixed by law, which committee may exercise, during the interim

between sessions of the Legislative Assembly, such of the following powers as may be conferred upon it by law:

"(a)   Where an emergency exists, to allocate to any state agency, out of any emergency fund that may be appropriated to the committee for that purpose, additional funds beyond the amount appropriated to the agency by the Legislative Assembly, or funds to carry on an activity required by law for which an appropriation was not made.

"(b)   Where an emergency exists, to authorize any state agency to expend, from funds dedicated or continuously appropriated for the uses and purposes of the agency, sums in excess of the amount of the budget of the agency as approved in accordance with law.

"(c)   In the case of a new activity coming into existence at such a time as to preclude the possibility of submitting a budget to the Legislative Assembly for approval, to approve, or revise and approve, a budget of the money appropriated for such new activity.

"(d)   Where an emergency exists, to revise or amend the budgets of state agencies to the extent of authorizing transfers between expenditure classifications within the budget of an agency.

"(2)   The Legislative Assembly shall prescribe by law what shall constitute an emergency for the purposes of this section.

"(3)   As used in this section, 'state agency' means any elected or appointed officer, board, commission, department, institution, branch or other agency of the state government.

"(4)   The term of members of the joint committee established pursuant to this section shall run from the adjournment of one regular session to the organization of the next regular session. No member of a committee shall cease to be such member solely by reason of the expiration of his term of office as a member of the Legislative Assembly."

ORS 291.326 states:

"(1)   The Emergency Board, during the interim between sessions of the Legislative Assembly, may exercise the following powers:

"(a)   Where an emergency exists, to allocate to any state agency, out of any emergency fund that may be appropriated to the Emergency Board for that purpose, additional funds beyond the amount appropriated to the

agency by the Legislative Assembly, or funds to carry on an activity required by law for which an appropriation was not made.

"(b)     Where an emergency exists, to authorize any state agency to expend, from funds dedicated or continuously appropriated for the uses and purposes of the agency, sums in excess of the amount of the budget of the agency as approved in accordance with law.

·"(c)     In the case of a new activity coming into existence at such a time as to preclude the possibility of submitting a budget to the Legislative Assembly for approval, to approve, or revise and approve, a budget of the money appropriated for such new activity.

"(d)     Where an emergency exists, to revise or amend the budgets of state agencies to the extent of authorizing transfers between expenditure classifications within the budget of an agency.

"(2)     No allocation, authorization or approval under paragraph (a), (b) or (c) of subsection (1) of this section shall be effective unless made at a meeting at which 10 members of the board were present.

"(3)     The laws enacted by the Legislative Assembly making appropriations and limiting expenditures, or either, are not intended to limit the powers of the Emergency Board."