Argued and submitted September 15, judgment of circuit court reversed, case remanded to circuit court for further proceedings October 7, reconsideration denied October 20, 1998

Susan LEO
and Jonah P. Hymes,
*Plaintiffs-Appellants,*

*v.*

Phil KEISLING,
Secretary of State,
and State of Oregon,
*Defendants-Respondents.*

(CC 98C-17232; CA A103357; SC S45677)

964 P2d 1023

Emily Simon, Portland, argued the cause for appellants. With her on the brief were Katherine A. McDowell and Scott Garland, ACLU Foundation of Oregon, Portland.

Richard D. Wasserman, Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Kulongoski and Leeson, Justices.**

LEESON, J.

** Riggs, J., did not participate in the decision of this case.

**LEESON, J.**

In this certified appeal, the parties ask us to decide the following question:

"Is it unconstitutional for the Secretary of State to qualify an initiative to the ballot, relying on that 'margin of error,' 'within the acceptable limits of the target,' or any other similar statistical term, if the two statistical samplings done both produce estimates that the initiative petition was not 'signed by a number of qualified voters equal [or greater than] six (6) percent of the total number of votes' in the last gubernatorial election in Oregon?" (Brackets in original.)

The parties frame that question in the context of a challenge to the Secretary of State's determination that initiative petition #53[1] contains the required number of valid signatures to qualify for placement on the November 1998 general election ballot. In determining that the petition contained the required number of valid signatures, the Secretary of State relied on what the parties refer to as the "margin of error" contained in OAR 165-014-0030, which provides that the Secretary of State will not exclude a petition for a proposed initiative from the ballot for insufficient signatures, unless statistical sampling shows that it is more than 80 percent likely that the petition lacks sufficient valid signatures.[2] Such reliance, plaintiffs claim, is impermissible, because of the requirement in Article IV, section 1(2)(b), of the Oregon Constitution, that an initiative petition must contain a specified number of signatures in order to be placed on the ballot.

Plaintiffs Leo and Hymes brought this action in circuit court, alleging that the Secretary of State exceeded his

---

[1] Because the underlying issue in this case is whether initiative petition #53 qualified to become a ballot measure, we refer to it here as "initiative petition #53." However, under OEC 201(f), we take judicial notice that on September 3, 1998, the Secretary of State certified initiative petition #53 to the November 1998 general election ballot, and it now is known as Ballot Measure #61.

[2] The parties have stipulated, in part, as follows:

"21. What we are calling the 'margin of error' for purposes of these stipulations is not any set number, but rather is individually calculated for each initiative petition under the Secretary of State's rules. The goal of these calculations is to express a mathematical probability that the number of valid signatures submitted was, for present purposes, more or less than 73,261."

authority by declaring that initiative petition #53 qualified for the November 1998 general election ballot. Plaintiffs sought a declaration that the petition "had insufficient signatures for placement on the ballot." They also sought to enjoin the Secretary of State from certifying the petition to the ballot or, alternatively, from "taking any further action to place" that petition on the ballot. The circuit court rejected plaintiffs' claims for declaratory and injunctive relief and entered judgment for defendants. Plaintiffs appealed to the Court of Appeals, which certified the appeal to this court.

We do not reach the constitutional question that the parties have presented. Rather, we resolve the case on a subconstitutional basis. *See Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 564, 687 P2d 785 (1984) (requiring court first to look to subconstitutional bases for disposition, before addressing constitutional challenge to administrative rule). We conclude that, in this case, the provision of OAR 165-014-0030 (the "acceptance/rejection limit" in Appendix I) that allows the Secretary of State to qualify an initiative petition for the ballot even though the Secretary of State is up to 80 percent certain that the petition does not contain the required number of signatures violates ORS 250.105(4), the statute pursuant to which OAR 165-014-0030 was promulgated.[3] Accordingly, we reverse the judgment of the circuit court and remand the case to that court for further proceedings.

Article IV, section 1(2)(b), of the Oregon Constitution, provides:

"An initiative law may be proposed only by a petition signed by a number of qualified voters equal to six percent of the total number of votes cast for all candidates for Governor at the election at which a Governor was elected for a term of four years next preceding the filing of the petition."

Six percent of the total number of votes cast for all candidates for Governor during the last election is 73,261. Supporters of initiative petition #53 submitted a petition containing 92,577

---

[3] The text of ORS 250.105(4) and the relevant parts of OAR 165-014-0030 are set out below.

signatures to the Secretary of State for verification. Consistent with ORS 250.105(4), which requires the Secretary of State to designate a statistical sampling technique to verify that a petition contains the required number of signatures, and as required by OAR 165-014-0030, the rule promulgated pursuant to the statute, the Secretary of State used a statistical random sampling technique to obtain a sample of at least 1,000 of the signatures appearing on the petition submitted in support of placing initiative petition #53 on the ballot. A check of the signatures in that sample yielded an estimate that, of the 92,577 signatures received, only 73,135 signatures—126 fewer than the 73,261 required to qualify initiative petition #53 for the ballot—were valid.

Because the estimate from the first sample indicated that the petition did not contain the required number of signatures, the Secretary of State, again consistent with the statute and pursuant to the administrative rule, obtained a second sample, which combined the initial sample with at least 4,000 additional signatures appearing on the petition. A check of the signatures on that combined sample produced an estimate lower than that obtained from the first sample: 73,088 valid signatures, which was 173 fewer than the required number.[4] Nonetheless, based on an application of the "acceptance/rejection limit" for a petition contained in OAR 165-014-0030, the Secretary of State announced that

> "following the completion of a second signature sample, initiative petition #53 qualified for the ballot with an estimated 73,088 valid signatures. *While this appears to be 173 signatures fewer than the 73,261 signatures required by the Constitution*, it is, in fact, within the ½ of one percent margin of statistical error *permitted by administrative rule*." (Emphasis added; footnote omitted.)

In other words, the Secretary of State's best estimate based on the two statistical samples was that the petition supporting initiative petition #53 was 173 signatures (less than one-half of one percent) below the required number of 73,261.

---

[1] The parties have stipulated that "[i]f a citizen submitted a petition with 73,088 signatures that were all valid, that petition would not be qualified for the ballot."

However, relying on the "acceptance/rejection limit" contained in the administrative rule, which permits acceptance of a petition even though the Secretary of State is up to 80 percent certain that the petition does not contain the required number of signatures, the Secretary of State declared that initiative petition #53 qualified for the ballot. The present action followed.

■ ■    As noted, the parties present the single, constitutional question quoted at the beginning of this opinion. However, it is well established that this court ordinarily does not decide constitutional issues if there is an adequate subconstitutional basis for decision. *See Planned Parenthood Assn.*, 297 Or at 564 (invalidating administrative rule challenged on constitutional grounds as exceeding statutory authority of agency). As this court has stated:

> "the proper sequence begins with an examination of ordinary rules of law and the scope and limits of legal authorization before reaching any constitutional issue, because when some challenged practice is not authorized by law, the court acts prematurely if it decides whether the practice could be authorized without violating the constitution."
> *State v. Lowry*, 295 Or 337, 343, 667 P2d 996 (1983).

The rule against deciding constitutional questions when subconstitutional grounds for decision exist especially is cogent when, as here, "this court confronts an unnaturally short period of time within which to issue a decision." *State ex rel Keisling v. Norblad*, 317 Or 615, 624, 860 P2d 241 (1993). Thus, although the parties attempt to frame the issue only in constitutional terms, we first must consider whether application of the Secretary of State's rule in this case comports with relevant subconstitutional rules of law. *See id.* at 624-25 (describing judicial restraint implicit in preference for subconstitutional decisions). We conduct that inquiry to ensure that the challenged action "was authorized by the state's * * * politically accountable policy makers." *Planned Parenthood Assn.*, 297 Or at 565. In this case, the politically accountable policy maker is the legislature, because it enacted ORS 250.105(4).

■    The proper sequence in analyzing the legality of action taken by officials who are exercising delegated authority is to determine first whether the officials acted within the

scope of their authority and then whether the action that they took followed the procedures prescribed by statute or regulation. *Ibid.* Neither of those matters is in question here. The next determination is whether the substance of the action departed from a legal standard expressed or implied in the law being administered. *Ibid.* That inquiry leads us to examine ORS 250.105(4), which contains the statutory directive on which OAR 165-014-0030 is based. ORS 250.105(4) provides:

> "The Secretary of State by rule shall designate a statistical sampling technique *to verify whether a petition contains the required number of signatures of electors.* A petition shall not be rejected for the reason that it contains less than the required number of signatures unless two separate sampling processes both establish that the petition lacks the required number of signatures. The second sampling must contain a larger number of signatures than the first sampling." (Emphasis added.)

In interpreting that statute, our objective is to discern the intent of the legislature. We follow the familiar template in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), first examining the statute's text and context. Context includes other provisions of the same statute and other related statutes. *Id.* at 611. In a case such as this, which, as discussed below, involves a statute enacted pursuant to express constitutional direction, context also may include relevant constitutional provisions. When construing a statute, we give words of common usage their "plain, natural, and ordinary meaning." *Ibid.* If our analysis of those sources discloses the legislature's intent, we proceed no further. *Ibid.*

ORS 250.105(4) responds to the mandate of Article IV, section 1(4)(a), of the Oregon Constitution, that the legislature shall "provide by law for the manner in which the Secretary of State shall determine whether a petition contains the required number of signatures of qualified voters." The phrase, "the required number of signatures of qualified voters" refers to Article IV, sections 1(2)(b) and (c), which specify the number of signatures that are required on a petition in order to propose a law or constitutional amendment by initiative.

■     ORS 250.105(4) requires the Secretary of State to adopt a rule that designates a statistical sampling technique to *verify* whether a petition in support of an initiative measure contains *the required number of signatures of electors*. The relevant dictionary definition of "verify" is as follows:

> "* * * 2 : to prove to be true: establish the truth of: conclusively demonstrate by presentation of facts or by sound reasoning or argument * * * 3 : to serve as conclusive evidence, argument, proof, or demonstration of * * * 4 : to check or test the accuracy or exactness of: confirm the truth or truthfulness of by or as if by comparison with known data or a recognized standard of authority * * * 5 : to confirm or establish the authenticity or existence of by examination, investigation, or competent evidence." *Webster's Third New Int'l Dictionary*, 2543 (unabridged ed 1993).

Each of the definitions of "verify" indicates the act of confirming. The very next sentence of the statute—the closest possible context—directs that a petition "not be rejected * * * *unless* two separate sampling processes both establish that the petition lacks the required number of signatures." (Emphasis added.) The necessary implication of the statute's wording is that the Secretary of State shall reject a petition, under the statistical sampling method, in the circumstances presented here.

According to the text and context of ORS 250.105(4), it is clear that the legislature intends the Secretary of State to designate a statistical sampling technique that confirms that a given initiative petition contains the required number of signatures before qualifying that petition for the ballot. The remaining question is whether the Secretary of State in this case verified, as the statute requires, that initiative petition #53 contains the required number of signatures.

We turn to an examination of OAR 165-014-0030, which the Secretary of State adopted "to implement ORS 250.105(4)." That rule provides the method that the Secretary of State uses to determine whether a petition contains the required number of signatures. In addition to verifying that each signature sheet contains the signature of the circulator and requiring that up to two samples, one of at least

1,000, and the other of at least an additional 4,000, signatures be gathered for verification, OAR 165-014-0030 provides, in part:

"(13)   If the results of the 'first' sample do not qualify the petition the 'second' sample data will be added to the 'first' sample data and the combined results will be applied to the sampling formula. The formula will show that:

"(a)   The petition has a sufficient number of valid signatures;

"(b)   The petition does not have a sufficient number of valid signatures."

The "sampling formula" to which OAR 165-014-0030 refers is contained in Appendix I to the rule. For petitions requiring "second" sample data, the sampling formula provides that "[a] simple limit * * * is established for acceptance/rejection":

"The limit is set to give a probability of 80% (or any desired probability) that a petition with [fewer than the required number of signatures] will be accepted on the combined sample even though it was not accepted on the first sample." OAR chapter 165, division 14, Appendix I.

The parties have stipulated to the following summary of the effect of the "acceptance/rejection limit" in this case: "The Secretary of State's rules require an 80% probability that an initiative petition lacks sufficient signatures before it can be rejected." In his brief to this court, the Secretary of State explains the policy choice embedded in that "acceptance/ rejection limit":

"The Secretary of State has decided to exclude a proposed initiative from the ballot only when lawful statistical sampling demonstrates a high degree of certainty that the petition contains insufficient valid signatures."

The question, therefore, is whether the policy choice contained in the administrative rule is authorized by the statute. ORS 250.105(4) directs the Secretary of State to *verify* that a petition contains the required number of signatures. The "acceptance/rejection limit" in OAR 165-014-0030 allows the Secretary of State to qualify an initiative for the ballot even if the Secretary of State is up to 80 percent certain that he has *not* verified that the petition contains the required number of .

signatures. In other words, the policy contained in the "acceptance/rejection limit" allows the Secretary of State to resolve most doubts about whether an initiative petition contains the required number of signatures in favor of placing measures on the ballot. That policy cannot be reconciled with the policy in the statutory directive: "to verify" that a petition contains the required number of signatures, *i.e.*, six percent of the total number of votes cast for all candidates in the last gubernatorial election.

In this case, the Secretary of State declared that initiative petition #53 qualified for the November 1998 general election ballot without first verifying—that is, confirming—that the petition contained 73,261 signatures. Plaintiffs were entitled to a declaratory judgment that the Secretary of State violated ORS 250.105(4) by qualifying initiative petition #53 to the ballot without first verifying that the petition contained the required number of signatures, and this opinion shall have that effect. The circuit court's contrary conclusion was error.

As noted earlier in this opinion, plaintiffs also sought injunctive relief in the circuit court. In this court, they request an order

"* * * removing [initiative petition #53] from the ballot, or, in the alternative, an order preventing and enjoining defendant Secretary of State or any other government entity from taking any further action allowing the measure to remain on the ballot unless and until there is an individual verification that a constitutionally sufficient number of signatures exists to allow the measure to remain on the ballot."

We do not find those requests for relief to be well taken. The range of choices available to the Secretary of State as a result of our decision in this case is a matter to be addressed to the Secretary of State in the first instance. *See, e.g., Burke v. Children's Services Division*, 288 Or 533, 548, 607 P2d 141 (1980) ("We will not assume that the defendant agencies of the State of Oregon will, in the absence of an injunction, refuse to follow the law as we have stated it.").

The judgment of the circuit court is reversed. The case is remanded to the circuit court for further proceedings.

Pursuant to ORAP 1.20(4), and notwithstanding ORAP 14.05(3)(b), the State Court Administrator shall issue the appellate judgment at 12:00 p.m. on Monday, October 12, 1998, unless a petition for reconsideration is both filed with and received by the office of the State Court Administrator by that time. Any timely petition for reconsideration will stay issuance of the appellate judgment until the court acts on such petition.