Argued and submitted September 20, affirmed November 24, 1999

DOUGLAS ELECTRIC COOPERATIVE
and International Paper Company,
*Respondents,*

*v.*

CENTRAL LINCOLN PEOPLE'S UTILITY DISTRICT,
*Appellant.*

(97 CV 4616CC; CA A102812)

991 P2d 1060

Richard S. Diaz argued the cause for appellant. With him on the briefs was Macpherson, Gintner, Gordon & Diaz.

Melinda Davison argued the cause for respondent International Paper Company. With her on the brief were S. Bradley Van Cleve and Duncan, Weinberg, Genzer & Pembroke, P.C., and jointly on the brief were Roland A. Johnson and Walton Nilsen Johnson & Guerra, P.C. for respondent Douglas Electric Cooperative.

Robert A. Lucas and Lucas & Associates filed a brief *amici curiae* for Columbia River PUD.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

## BREWER, J.

Defendant, Central Lincoln People's Utility District (District), appeals from a trial court judgment determining that, pursuant to a contract between plaintiffs Douglas Electric Cooperative (Douglas) and International Paper Company (IP), Douglas has the right to sell electric power to IP for use in its Gardiner, Oregon mill (the mill), and IP has the right to obtain such electric utility services from Douglas, even though the mill is located within District's boundary. The central issue presented in this appeal is whether Article XI, section 12, of the Oregon Constitution (section 12), or the provisions of ORS chapter 261 give a people's utility district the exclusive right to provide electric energy within District's boundary. The trial court concluded that a people's utility district has no such exclusive right. We agree and, therefore, affirm.

The parties disagree about our standard of review of the trial court's findings. District argues that our review is *de novo* and Douglas and IP contend that we should review for substantial evidence. We need not resolve that disagreement, because the pertinent facts do not appear to be in dispute and because no party assigns error to or otherwise complains about any of the trial court's findings:

"1.   [Douglas] is an Oregon cooperative corporation organized under Chapter 62 of the Oregon Revised Statutes to provide electric utility services in the State of Oregon. Douglas serves customers in Coos, Douglas and Lane counties.

"2.   [IP] is a New York Corporation engaged in the business of making paper products. IP owns and operates a mill located in Gardiner, Douglas County, Oregon ([the mill]). [The mill] produces liner board.

"3.   [District] is a people's utility district formed pursuant to ORS Chapter 261 and under authority of [section 12].

"4.   [The mill] is located within the political boundaries of [District].

"5.  [District] has since 1962 supplied the electric power requirements of [the mill]. Currently, [District] supplies those requirements pursuant to a contract that terminates on December 31, 1998.

"6.  On September 18, 1997, Douglas and IP entered into a contract under which Douglas agreed to supply and IP agreed to purchase the electric power requirements of [the mill], including transmission and metering services, commencing on January 1, 1999.

"7.  Douglas operates electric distribution facilities in the vicinity of [the mill]. To provide electric service to [the mill], Douglas must make modifications to its facilities and to its point of interconnection with the Bonneville Power Administration ('BPA').

"8.  In October 1997, IP informed [District] that IP intended Douglas to be its electric utility provider beginning January 1, 1999.

"9.  [District] denies that Douglas has a legal right to provide electric service to [the mill], and refuses to cooperate with IP and Douglas in the implementation of the contract between IP and Douglas.

"10.  [District], under ORS Chapter 758, specifically ORS 758.435, has recently applied to the Oregon Public Utility Commission [(PUC)] for an allocation of an exclusive service territory to serve customers, including IP, within its political boundaries.

"11.  The application mentioned above is at this time pending before [PUC].

"12.  Douglas is not presently serving IP.

"13.  The Gardiner Substation of BPA needs to be modified in order to allow Douglas to provide electric service to [the mill]. Should Douglas establish the legal right under State law to provide electric service to [the mill], BPA will perform the necessary work so that Douglas will be able to provide the electric service.

"14.  A finding that [District] does not have an exclusive territory within its political boundaries may result in a rate increase to its remaining customers and may have a negative impact on [District] in the bond market."

District's application to PUC for an exclusive allocated territory, including the Gardiner mill area, was pending when the trial court entered its judgment. Subsequently, that application was denied, although PUC later allocated other territory to District.[1]

When District refused to cooperate with Douglas and IP in implementing their contract, and when BPA refused to consent to the necessary modification of its substation until Douglas's right to serve the mill was established, plaintiffs brought this declaratory judgment proceeding. They contended that neither section 12 nor ORS chapter 261 gives District the exclusive right to serve the mill and that the provisions of ORS 758.400 to ORS 758.475 instead provide the means by which a utility, including a people's utility district, can obtain an exclusive right to serve a designated area. In response, District argued that its exclusive right to serve customers within its district boundaries, including the mill, was guaranteed by section 12 or by the terms of ORS chapter 261.

The trial court did not agree with District. The court concluded that "[n]othing in [section 12 or in ORS chapter 261] gives [District] or any other people's utility district the *exclusive* right to serve customers within their political boundaries." (Emphasis in original.) Based on that conclusion, the trial court determined that, pursuant to the contract between Douglas and IP, "beginning January 1, 1999, IP has the right to obtain electric utility services from Douglas * * * and Douglas has the right to sell and deliver electric power over its distribution system to IP." On appeal, District attacks those conclusions, contending that the trial court erred and that it has the exclusive right to serve those within its boundaries, irrespective of whether it has been granted an allocated territory by PUC.

■     We begin our analysis by examining the provisions of section 12. Normally, we would begin with nonconstitutional issues and first consider District's statutory claims. *Leo v. Keisling*, 327 Or 556, 560, 964 P2d 1023 (1998). Here, we do

---

[1] On appeal, we granted plaintiffs' request that we take judicial notice of these PUC orders. *See* OEC 202(2) (providing for judicial notice of official acts of this state's executive department).

not follow that customary route because the essence of District's claim based on ORS chapter 261 is that the statutes cannot detract from the authority granted to people's utility districts by section 12. Because District's statutory claim appears to depend, in the first instance, on an interpretation of the constitutional provision itself, we begin our analysis there.

■      As an initial matter, the parties disagree about the methodology that we should apply in analyzing this constitutional provision, which was adopted as an initiative measure. Plaintiffs argue that we should begin with an examination of the constitutional text and that we should turn to the underlying history and to case law only if we find some ambiguity in that text. District contends that, even in the absence of ambiguity, we should examine the text, the events surrounding the enactment of the provision, and interpretive case law. Oregon Supreme Court decisions make clear that

> "[o]ur methodology for interpreting a constitutional provision adopted by initiative is to examine the text and context of the provision * * *. If the voters' intent is not clear from an analysis of text and context, we also examine the history of the provision." *Armatta v. Kitzhaber*, 327 Or 250, 256 n 4, 959 P2d 49 (1998).

*See also Ecumenical Industries v. Oregon State Lottery Comm.*, 318 Or 551, 559, 871 P2d 106 (1994) (same); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 612 n 4, 859 P2d 1143 (1993) (*PGE* methodology "applies, not only to statutes enacted by the legislature, but also to the interpretation of laws and constitutional amendments adopted by initiative or referendum").

Section 12 was adopted by initiative. *See In Re People's Utility District*, 160 Or 530, 533, 86 P2d 460 (1939) (section 12 was "adopted in 1930 by the electors of the state under the initiative petition"). Therefore, we cannot err by applying the *PGE* analysis to that constitutional provision. Moreover, as we explain below, even if we assume that District is entitled to have us examine the pertinent case law and the historical circumstances leading to the adoption of section 12 irrespective of whether the constitutional text is ambiguous, those secondary sources prove to be no more

helpful to District than the constitutional text. We turn to an examination of that text.

Section 12 provides:

"Peoples' Utility Districts may be created of territory, contiguous or otherwise, within one or more counties, and may consist of an incorporated municipality, or municipalities, with or without unincorporated territory, for the purpose of supplying water for domestic and municipal purposes; for the development of water power and/or electric energy; and for the distribution, disposal and sale of water, water power and electric energy. Such districts shall be managed by boards of directors, consisting of five members, who shall be residents of such districts. Such districts shall have power:

"(a)   To call and hold elections within their respective districts.

"(b)   To levy taxes upon the taxable property of such districts.

"(c)   To   issue,   sell   and   assume   evidences   of indebtedness.

"(d)   To enter into contracts.

"(e)   To exercise the power of eminent domain.

"(f)   To acquire and hold real and other property necessary or incident to the business of such districts.

"(g)   To acquire, develop, and/or otherwise provide for a supply of water, water power and electric energy.

"Such districts may sell, distribute and/or otherwise dispose of water, water power and electric energy within or without the territory of such districts.

"The legislative assembly shall and the people may provide any legislation, that may be necessary, in addition to existing laws, to carry out the provisions of this section."

As we have noted, although District argues that it has the exclusive right to provide electric energy to those customers within its boundaries, including the mill, it admits that the right that it seeks to derive from section 12 is "not spelled out explicitly" in the constitutional text. *Amicus* Columbia River PUD makes a similar admission. We agree.

The constitutional text does not confer on a people's utility district any exclusive right to serve those who are within its boundaries. Indeed, to the rather limited extent that the text deals with the topic at all, it appears to support the opposite conclusion, reached by the trial court.

Section 12 permits people's utility districts to "sell, distribute and/or otherwise dispose of water, water power and electric energy within *or without* the territory of such districts." (Emphasis added.) The constitutional text does not appear to draw a distinction between a district's authority to sell to those customers within and those outside the district boundaries. Therefore, if the constitutional provision were read to grant an exclusive right to serve customers within the district's boundaries, it would also grant such an exclusive right to serve those outside the boundaries.[2] That conclusion makes no sense, because it would seem to grant to a people's utility district a virtually unlimited right to serve customers all over the state,[3] leading to almost inevitable overlap in the supposedly exclusive territories of and conflict between competing districts. Nothing in the constitutional text supports such a strained and unlikely reading.

District argues, however, that the right to provide exclusive utility service to those within the boundaries of a people's utility district should be implied from other powers that are explicitly granted to such districts by section 12. District points to the authority granted to "levy taxes upon the taxable property of such districts" and to "exercise the power of eminent domain." Section 12(b), (e). As a matter of textual analysis, it is not at all apparent why a constitutional provision expressly granting those powers should be read as implicitly granting the apparently unrelated authority exclusively to serve those within a district's boundaries. Indeed, the specific enumeration of those (and other) powers may suggest that had the voters intended to include among the

---

[2] *Amicus* Columbia River PUD asserts that "PUDs have no exclusive right nor do they claim such a right to serve outside their boundaries," but does not explain how the constitutional text supports the distinction *amicus* wants to draw between a people's utility district's authority to serve those within and those without its boundaries.

[3] A district's territory may extend to "one or more counties" and need not be "contiguous." Or Const, Art XI, § 12.

powers granted to such districts the exclusive right to serve all customers within a people's utility district boundaries, that authority also would have been granted expressly by the constitutional provision.

■      In addition, we are not convinced that the power to provide an exclusive service can be inferred from the authority to tax or to exercise the power of eminent domain. School districts, for example, have the authority to levy property taxes, subject to certain constitutional limitations as to the amount of those taxes, *see, e.g.,* Article XI, section 11(4)(a)(B), and to condemn property for public use, *see* ORS 35.215(1), but they clearly do not have the exclusive right to serve all students within a district's boundaries.

In arguing that its "constitutionally granted power of eminent domain establishes a right to exclusivity of service," District relies on decisions from other jurisdictions, which it claims hold that the right to serve all customers exclusively can be implied from the power of eminent domain. None of those cases aids District. *Hallie v. Eau Claire,* 471 US 34, 105 S Ct 1713, 85 L Ed 2d 24 (1985), for example, has nothing to do with the power of eminent domain. Instead, the Court considered whether the municipality's anti-competitive activity was protected by the state-action exception to federal anti-trust laws. *City of Abbeville v. Aiken Elec. Co-op., Inc.,* 287 SC 361, 369, 338 SE2d 831 (1985), holds that annexation by a city, "in the absence of statutorily delegated powers of eminent domain, does not authorize an ouster" of a utility by the city. That decision from another state, which does not appear to be based on any provision akin to section 12, provides no persuasive support for the proposition that granting the power of eminent domain to a people's utility district gives it any exclusive right to serve. *Unity Light & Power Co. v. City of Burley,* 92 Idaho 499, 502, 445 P2d 720 (1968), concludes that annexation of an area by a city does not authorize the ouster of a utility already serving the area in the absence of *exercise* of the power of condemnation. The decision is inapposite. Finally, in *Franklin Pow. & L. Co. v. Middle Tenn. Elec. Mem. Corp.,* 222 Tenn 182, 188, 434 SW2d 829 (1968), the court relied on a Tennessee statute expressly giving an annexing municipality " 'the *exclusive* right to perform or provide * * * utility

functions and services in any territory which it annexes.'" (Emphasis added.) In contrast, section 12 grants no such express right.

■ Accordingly, we conclude that the text of section 12 does not grant a people's utility district an exclusive right to serve all those within its boundaries. Such a right is not expressly granted by the constitutional text and cannot be inferred from context. Assuming for the sake of argument that the text is ambiguous, the history of the initiative also provides no support for District's argument that it must have such an exclusive right.

■ "The history of a measure enacted by the voters includes the ballot title and other materials contained in the voters' pamphlet." *State v. Lanig,* 154 Or App 665, 674, 963 P2d 58 (1998). District points to nothing specific in those materials that supports its reading of the constitutional provision. The initiative measure that became section 12 "was known as the 'Grange Amendment' in the 1930 general election." *Emerald PUD v. PP&L,* 302 Or 256, 258, 729 P2d 552 (1986). The Voters' Pamphlet argument in favor of the amendment that was submitted by the Grange indicates that "the purpose of th[e] amendment" was "to give the people of the state an undisputed right to organize themselves into districts for the purpose of supplying water, water power and electricity *to any one who may want any or all of these.*" (Emphasis added.) That statement does not suggest that a people's utility district would have any exclusive right to provide such utility services. We have examined all of the Voters' Pamphlet materials dealing with what became section 12 and the ballot title for the measure and find nothing that supports District's assertion that it has such a right.

We also have reviewed the other materials cited by District, as well as other sources describing the historical circumstances that led to the enactment of section 12. *Emerald PUD,* 302 Or at 258-61; Betty L. Brown, *People's Utility Districts in Oregon,* 20 Or L Rev 3, 6-8 (1940); Irvin Rooks and Harry R. Booth, *Current Problems of Public Utility Rate Regulation,* 13 Or L Rev 122, 122 (1934); Guy S. Claire, *Recent Utility Regulation in Oregon,* 11 Or L Rev 338, 340, 346-47 (1932); 41 Op Atty Gen 335, 336-47 (1981), *cited with*

*approval* in *Emerald PUD*, 302 Or at 269 n 6. Those sources and the history they describe also do not support District's claim that a people's utility district has an exclusive right to serve all those within its boundaries. The materials demonstrate that "[d]issatisfaction and distrust of private operation" of utilities, Rooks and Booth, 13 Or L Rev at 122, and frustration over the fact that utility rates had not fallen significantly during at least the early portion of the depression in the 1930s, " 'cast a shadow of ill-feeling over the entire industry,' " *Emerald PUD,* 302 Or at 259 (quoting 13 Or L Rev at 122), and that that dissatisfaction and distrust led to a "movement towards public operation" of utilities, Rooks and Booth, 13 Or L Rev at 122, including "the formation of people's utility districts." Brown, 20 Or L Rev at 3. The materials do not, however, support the lengthy leap from those generalities to the claimed right exclusively to serve all customers in a district.

The case law regarding section 12 also does not support District's position. None of the cases dealing with section 12 has held that a people's utility district has the exclusive right to serve those within the district's boundary. District relies on *Central Lincoln P.U.D. v. Smith,* 170 Or 356, 358-60, 133 P2d 702 (1943), which holds that a people's utility district may sell and distribute power to customers outside its boundaries, but we fail to see how that authority leads to the conclusion that such a district has an exclusive right to serve those within the boundary. District also cites decisions stating that people's utility districts have "broad powers." *See, e.g., Emerald PUD,* 302 Or at 258; *In Re People's Utility District,* 160 Or at 536. That general observation also does not lead to the conclusion that such a district has any exclusive right to serve those within its boundaries.[4]

---

[1] District also relies on 17 Op Atty Gen 665 (1936), for the proposition that it has the duty to serve all those within its boundaries. District reasons that if it has that duty, then it must also have the authority to serve exclusively. That reasoning is questionable. Public schools have a duty to serve all eligible students, but that duty does not equate with the authority to exclude all other source of education. In any event, a subsequent Attorney General's opinion clarifies that, in that office's view, a people's utility district's "duty is only to provide service on equal terms to *applicants* within its geographic boundaries." 45 Op Atty Gen 209, 215 (1987) (emphasis in original).

■ In sum, we conclude that section 12 does not give a people's utility district the exclusive right to serve those within its boundaries. We turn, therefore, to an examination of the provisions of ORS chapter 261, the statutory source of authority upon which District relies. As we have noted, rather than relying on the text of any specific provision of ORS chapter 261 (which contains the legislation implementing section 12, *Emerald PUD,* 302 Or at 261), District's argument appears instead to be that nothing in those statutes limits the right to serve exclusively that District attempts to derive from the constitutional provision itself. Because we have rejected District's constitutional claim, its statutory argument also fails.[5]

District also argues that a people's utility district is akin to a municipality and that ORS chapter 261 "clearly recognizes that PUDs are not limited to those powers explicitly set forth in the statute, but may take other actions not expressly provided for as long as they conform with the spirit of the Constitutional amendment and Chapter 261." As discussed above, District's reliance on the spirit of the constitutional provision and the implementing statutes appears to depart from the methodology prescribed by *PGE* and *Ecumenical Ministries.* In any event, District has not convinced us that either the constitutional provision or the statutes compels the conclusion that a people's utility district has an exclusive right to serve those within its boundaries. District suggests that it will be harmed unless it has such an exclusive right to serve, but ORS 758.400 to ORS 758.475 provide a procedure by which a utility may obtain the exclusive right to serve a territory. The purpose of those statutes is to avoid the "duplication of utility facilities," to "promote the efficient and economic use and development and safety of

---

[5] The 1999 Legislature adopted a provision stating, in part, that it is the policy of this state as to "consumer-owned utilities," including people's utility districts, to "[p]reserve the existing exclusive distribution rights of [such] electric utilities as and to the extent such rights exist under current law." Or Laws 1999, ch 865, § 22. Another section of the same 1999 act provides that, notwithstanding earlier provisions of that act, "a consumer-owned utility shall have exclusive distribution rights, to the extent such rights are provided by law * * *," and that "[n]othing in th[e] section shall diminish or enlarge the rights of any person under ORS 758.400 to [ORS] 758.475." Or Laws 1999, ch 865, § 26. No party suggests that these 1999 laws have any effect on this case, and we express no opinion regarding the effect, if any, that these laws might have on the legal questions presented here.

operation of utility services," and to ensure "adequate and reasonable services to all territories and customers[.]" ORS 758.405. District admits that the statutes apply to it and, on appeal, it has abandoned any constitutional challenge to the application of those statutes to a people's utility district. As noted, District's application for an exclusive service territory, including the Gardiner mill area, was denied by the PUC.

District's claim that it is akin to a municipality and that it, therefore, has the power to serve exclusively also is flawed. Although "the terms 'municipality' and 'municipalities' have no fixed meanings" but rather have "meanings that depend upon the context in which they are used," *Emerald PUD*, 302 Or at 265-66, people's utility districts, unlike cities and towns, do not derive their powers from charters, but instead "from the constitution and from the statutes." *Id.* at 269. As noted, those sources of authority do not give a people's utility district the right exclusively to serve those within its boundaries. Moreover, a city, unlike a people's utility district, has specific statutory authority to "exclude or eject any [competing] utility" from its territory. ORS 221.420(2)(a). *See also PacifiCorp v. City of Ashland*, 88 Or App 15, 744 P2d 257 (1987), *on recons* 89 Or App 366, 371-72, 749 P2d 1189, *rev den* 305 Or 594 (1988) (discussing ORS 221.420(2)(a)).

Because a people's utility district has no exclusive constitutional or statutory right to serve those within its boundaries, the trial court correctly held that, pursuant to the contract between plaintiffs Douglas and IP, Douglas has the right to sell electric power to IP and IP has the right to buy such power from Douglas for use in IP's Gardiner mill.

Affirmed.